**COMMONWEALTH of Pennsylvania,**
**Appellee,**

v.

**Kevin DAYS, Appellant.**

Superior Court of Pennsylvania.

Submitted Nov. 20, 2000.

Filed Oct. 16, 2001.

Jeffrey W. Miller, Greensburg, for appellant.

Heidi D. Norton, Assistant District Attorney, Greensburg, for Commonwealth, appellee.

Before: McEWEN, President Judge Emeritus, EAKIN and BROSKY, JJ.

EAKIN, J.:

¶ 1 Appellant, Kevin Days, appeals from the judgment of sentence following his conviction by a jury for possession, possession with intent to deliver and delivery of a controlled substance.

¶ 2 The conviction involves the March 1, 1999 delivery of crack cocaine to an undercover police officer at the home of appellant's former girlfriend, at 1031 Highland Manor, Monesson, Pennsylvania.

¶ 3 The Commonwealth intended, should appellant take the stand, to introduce a certified copy of a prior *crimen falsi* conviction for retail theft on the basis appellant would be placing his truthfulness and credibility into issue when he swore to tell the truth. N.T. Trial, 1/13/00, at 15–17. Appellant did testify, and stated he was not at Highland Manor on March 1, 1999. He admitted the retail theft conviction, and the trial court granted permission to the Commonwealth to cross-examine appellant about it.

¶ 4 The Commonwealth began the cross-examination by asking questions which established appellant previously lived at 1031 Highland Manor with his girlfriend and their three children. An exchange followed, during which appellant repeatedly volunteered that he had been previously arrested at 1031 Highland Manor.

Q: You—it's your testimony that you were never at 1031 Highland Manor anytime in the year 1999? Is that your testimony?

A: My testimony is—yes, I came to Highland Manor, but I was arrested.

Q: Well, the idea is that sometime during 1999 it would be your practice to be coming to and from 1031 Highland Manor.

A: It wouldn't be my practice, no.

Q: But you did.

A: Like I said, it's been time when I came there and I wasn't allowed and there was punishment behind it.

Q: But you were there. That's all—

A: Oh, through '99?

Q: Up to—

A: Yeah, there's been some in '99 that I was there, yes.

Q: So it's not your claim that there's—that you were never in 1031 Highland Manor—

A: I've been at 1031 since '97. I was there also in '97.

* * *

Q: I just want the jury to understand it's not your contention that you have never heard of 1031 Highland Manor but that in fact you are familiar with that residence.

A: I said yes.

Q: That you have lived there in the past.

A: Yes.

Q: That in 1999 whether you were allowed to or not you were at 1031 Highland Manor.

A: Yes, at times.

Q: In fact, you had been there just around the time March 1st, 1999 rolled around, correct?

A: No, that's not correct.

Q: That's not correct?

A: No.

Q: Your testimony is that you were not ever at 1031—

A: You said around March.

Q: Around March, let's say the following month, in April.

A: Yes, I was arrested.

*Id.,* at 293–94.

¶ 5 The Commonwealth continued with other questions, then returned to the subject of where appellant was on March 1, 1999:

Q: Mr. Days, tell the jury, please, given that you know that you were there some one month before that, some one month after that, and that you were there at various times in 1999, you don't know where you were at, how do you know you weren't there on March 1, 1999.

A: I came in there maybe January or February 1999 and was arrested. I came there maybe April or May of 1999 and I was arrested. And each time that I was arrested the person who lived at Highland Manor 1031 called the police and I was arrested for trespassing. I'm not allowed on the premises.

*Id.,* at 295–296.[1]

¶ 6 After this exchange, the Commonwealth did not ask about prior arrests during cross-examination. During redirect examination, appellant testified:

Q: But on this particular day and time you were not there selling drugs?

A: No, I was not. Each time, I would say each time that I—each time that I came to Highland Manor, I was arrested by the mother of my children, she called the police. Maybe I can't say her reasons for doing it, but she doesn't want me there, we have—we have a problem with the visitation of me seeing my kids, and if I'm staying at 226 McKee Avenue she's supposed to bring them to see me and she doesn't bring them for a couple days or three, four days, whatever, I take it upon myself to knock on the door. Well, can I take one or two of them, you know, we may get into a dispute and it turns into the police and I get arrested and it comes into a trespassing charge. And like I said, I pleaded guilty to the trespassing charge whenever it did happen, and I tried to explain to the magistrate, to the higher court judge that it should be some—we should see some type of on parenting classes because the—the visitation rights that I'm not allowed, I'm not even allowed to—in the apartment or even allowed them to come to my apartment. So this is the reason why I had the trespassing charges, because I felt it was necessary that I be involved to see my kids.

*Id.,* at 301–02.

¶ 7 During recross-examination, the following exchange occurred:

Q: Sir, you're not being altogether truthful about the relationship you have with the mother of your children, are you?

A: Yes.

1. Page 296 of the Official Transcript is missing. The Prothonotary of Westmoreland County was unable to locate a copy of the page. Both the Commonwealth and appellant's counsel refer to page 296 and quote language from page 296. Appellant's brief informs us the Commonwealth then asked on page 296, "Did you pled [sic] guilty to those charges?"

Q: It is your testimony that you and Tiwanda Russell have the kind of relationship where every time you go to 1031 Highland Manor you're arrested and charged with a crime? Is that your testimony?

A: If I'm coming to bring her money maybe she won't call the police.

\* \* \*

Q: In those times when you want to bring money for the phone bill, et cetera, you and Tiwanda Russell are both there at 1031 Highland Manor and the police are not contacted. That's all I'm trying to elicit from you.

A: Me and her are there?

Q: Well, you have to give her the money.

A: Well, I'm not—yes, I'm on the premises of Highhand [sic] Manor, yes, I'd be on the premises of Highland Manor.

Q: Earlier whenever you said something to the effect of every time you would go there you would get arrested, that actually wasn't true, was it?

*Id.*, at 303–05. The Commonwealth continued the recross-examination:

Q: Is it your testimony that you're doing absolutely nothing else while you're at 1031 Highland Manor other than being there that causes you to be arrested?

A: Nothing else.

*Id.*, at 311–12. After a weekend recess, appellant returned to the stand and testified he had been convicted on one occasion of damaging a steel door and on another occasion of damaging a lock at 1031 Highland Manor. *Id.*, at 338. At the conclusion of trial, the jury convicted him of the drug offenses.

¶ 8 Appellant raises the following issues on appeal:

I. Whether evidence of the defendant's prior criminal history was wrongly admitted into evidence?

a. Whether the Commonwealth violated the mandates of 42 Pa.C.S. § 5918 by questioning the defendant about prior criminal incidents, unrelated to the instant offenses?

b. Whether the Commonwealth violated the defendant's due process rights and Pennsylvania Rule of Evidence 609 by introducing evidence of prior criminal convictions which were not *crimen falsi?*

c. Whether the Commonwealth introduced evidence in violation of a pretrial agreement not to do so?

Appellant's Brief, at 3.

■ ¶ 9 Troopers Dschuhan and Alston testified appellant sold drugs at 1031 Highland Manor on March 1, 1999; appellant testified he was not at the residence that day. Accordingly, the truthfulness of these witnesses and appellant's recollection of that particular day was at the core of trial. On direct examination, appellant offered no reason why his recollection of that day, versus any other day, was so absolute. On cross-examination, the Commonwealth properly pointed out the lack of evidence corroborating his recollection, and suggested appellant was often at this residence where his children live, making suspect any date-specific recollection.

¶ 10 On redirect examination, appellant shifted the tenor of his alibi by volunteering "each time that I came to Highland Manor, I was arrested by the mother of my children." N.T. Trial, 1/13/00, at 301–02. This told the jury that whether he recalled the date or not, he could not have been there on pain of arrest. Appellant's testimony can be paraphrased as "I couldn't have been there, because I'd have been arrested simply for trying to see my kids." An attempt to victimize as well as

alibi himself, this introduced both the subject of prior arrests, and that of character.[2]

¶ 11 When the Commonwealth followed this with "You're not being truthful about your relationship with the kids' mother," appellant denied being untruthful. The exposure of his untruthfulness was not precluded because the rebutting evidence included prior criminal activity, particularly where he introduced the prior arrests in his own testimony. He is not insulated from being discredited about the factual accuracy of his testimony simply because that proof involves other crimes.

¶ 12 The questions regarding appellant's prior convictions also nullified the impression appellant created of himself as a dedicated father who was simply trying to see his children and who was the subject of unfair treatment by police and the children's mother. The Commonwealth's examination clarified that he was arrested not only for trespass but for criminal mischief and public drunkenness, which revealed appellant was untruthful with the jury about the reasons for his arrests at the residence.

¶ 13 In *Commonwealth v. Trignani*, 334 Pa.Super. 526, 483 A.2d 862, 869 (1984), a prior conviction was introduced to rebut the defendant's unsolicited assertion that he was a nonviolent person; this Court determined it was proper to use a prior conviction to rebut volunteered character testimony, as authorized by 42 Pa.C.S. § 5918(1). In the case before us, the evidence likewise came in not to show appellant committed other crimes, but to negate his "poor me" testimony. We agree with the trial court that appellant, by mentioning his arrests for trespassing, opened the door for further explanation about the calls to the police. *Commonwealth v. Palmer*, 315 Pa.Super. 601, 462 A.2d 755, 760 (1983) (citations omitted) (once a defendant has presented evidence to prove his good character or reputation, or has himself introduced evidence of his prior crimes, the prosecution has a limited right to introduce evidence of prior convictions in rebuttal).

¶ 14 The cross-examination also undercut any inference that the prospect of arrest deterred appellant from being at the site. The nature of the crimes shows he was charged for what he did there, not for being there. The prosecutor showed that arrest was avoidable if appellant behaved well toward his family; there being no such misconduct on March 1, 1999, his assertion that he could not have been there was properly challenged.

█ ¶ 15 A prosecutor may not malign an accused with irrelevant evidence of prior crimes, but when prior crimes or arrests are made relevant by the accused's own testimony, cross-examination on these points is entirely proper. We find no error by the learned trial court in permitting the jury to consider this relevant and enlightening cross-examination.

█ ¶ 16 Pennsylvania Rule of Evidence 609 provides:

> For the purpose of attacking the credibility of any witness, evidence that the witness has been convicted of a crime,

---

**2.** 42 Pa.C.S. § 5918 provides:
No person charged with any crime and called as a witness in his own behalf, shall be asked, or if asked, shall be required to answer, any question tending to show that he has committed, or been charged with, or been convicted of any offense other than the one wherewith he shall then be charged, or tending to show that he has been of bad character or reputation unless: (1) he shall have at such trial, personally or by counsel, ... [have] given evidence tending to prove his own good character or reputation[.]
42 Pa.C.S. § 5918.

whether by verdict or by plea of guilty or *nolo contendre*, shall be admitted if it involved dishonesty or false statement. Pa.R.E. 609(a). The retail theft conviction was the only *crimen falsi* conviction admitted against appellant pursuant to Pa.R.E. 609. The public drunkenness and criminal mischief convictions were introduced after appellant used the convictions to victimize and alibi himself. The convictions were not offered or admitted into evidence as crimes of dishonesty or false statement pursuant to Pa.R.E. 609. Thus, appellant's second claim is meritless.

■ ¶ 17 Finally, a review of the record reveals that prior to trial the parties did discuss that the Commonwealth would not question appellant about any *crimen falsi* convictions other than the retail theft conviction; however, there was no agreement the Commonwealth would not cross-examine appellant on other prior crimes made relevant by appellant himself during the course of the trial. Therefore, appellant's final claim must fail.

¶ 18 Accordingly, the judgment of sentence is affirmed.

¶ 19 BROSKY, J. files a Dissenting Opinion.

BROSKY, J., dissenting.

¶ 1 I dissent. Appellant was charged with delivering cocaine to an undercover police officer at 1031 Highland Manor in Monessen, Pennsylvania on March 1, 1999. Since, for reasons that are not readily apparent, Appellant was not taken into custody when he allegedly delivered the cocaine, we are forced to entrust that the police successfully identified Appellant as the person who delivered cocaine on the day in question. Not surprisingly, Appellant denied that he was the individual who delivered cocaine to 1031 Highland Manor on March 1, 1999, and further denied even

being at that location on the day in question. Moreover, Appellant's defense at trial was wholly comprised of his own testimony. As such, all that stood between Appellant and the loss of his freedom was his own credibility.

¶ 2 Although Appellant's own testimony essentially comprised his whole defense, it was rather brief. Appellant's entire direct examination consists of less than two typed pages of the more than 400 pages used to memorialize the proceedings of the trial. However, as one might expect, the cross-examination of Appellant was considerably more lengthy and, unfortunately, eventually devolved into an expose of Appellant's unrelated criminal past.

¶ 3 As the Majority establishes, during cross-examination, Appellant admitted to going to 1031 Highland Manor on occasion. However, in what must be considered a curious twist—certainly doing so could not be thought of as advancing his own cause—Appellant further volunteered that he was usually arrested when he would show up at 1031 Highland Manor. Despite the fact that Appellant's admissions were not terribly relevant to the matter being tried the questioning became even more attenuated. Over objection, and after an ensuing sidebar conference in which Appellant's counsel objected to the proposed line of questioning, the prosecutor was allowed to cross-examine Appellant as to certain convictions that resulted from events occurring at 1031 Highland Manor. In so doing not only did the Commonwealth introduce into evidence Appellant's convictions, but also the conduct forming a basis for those convictions.

¶ 4 A long-standing principle of our criminal jurisprudence provides that evidence that a criminal defendant has committed, been charged, or convicted of crimes, other than the one(s) charged in the current prosecution, is generally inad-

missible due to its highly prejudicial nature. The general reason that evidence of other crimes is prohibited is that it is not deemed particularly relevant proof of guilt of the crime the defendant stands trial for while it is acknowledged that the introduction of this evidence may very well prejudice the defendant by creating an emotional reaction on the part of the jury or fact finder and destroy the presumption of innocence which is the cornerstone of our criminal justice system. See *Commonwealth v. Hawkins*, 295 Pa.Super. 429, 441 A.2d 1308 (1982), *Commonwealth v. Bastone*, 262 Pa.Super. 590, 396 A.2d 1327 (1979). Consequently, the law has vigorously guarded against the admission of evidence of other crimes except where acknowledged exceptions apply. That is, until today, when the Majority sees fit to condone the needless admission of prejudicial material in what can only be described as prosecutorial overkill.[3]

¶ 5 The Majority suggests that there were two bases for allowing the testimony: first, that through a negative inference Appellant had somehow created an alibi defense that the Commonwealth was entitled to rebut by the introduction of countervailing evidence. In related fashion, the Majority suggests that Appellant had been "untruthful" in his assertion that he was always subjected to arrest when he visited 1031 Highland Manor, which also entitled the Commonwealth to rebut the untruthful comments. Secondly, the Majority asserts that the Commonwealth was entitled to rebut the impression Appellant created that he was "a dedicated father who was simply trying to see his children and who was the subject of unfair treatment by police and the children's mother." My analysis indicates that these reasons are both specious and insufficient grounds for allowing the cross-examination and/or disclosure of Appellant's other crimes evidence.

¶ 6 The Majority's first basis for allowing the evidence of other crimes was that it was necessary to refute Appellant's assertion that he was arrested every time he went to 1031 Highland Manor. According to the Majority, Appellant's assertion creates a sort of alibi by negative inference. The premise is apparently this: by his testimony, Appellant suggested that he had been arrested every time he visited 1031 Highland Manor, Appellant was not arrested on the day in question, ergo, he could not have been there on the day in question. In related manner, the Majority asserts that the evidence was properly introduced to demonstrate Appellant was untruthful in his assertion. However, when the Majority's reasoning is deconstructed and subjected to logical analysis it is revealed as unconvincing.

¶ 7 In the first place the Commonwealth and Majority's assertion is more fictional license than fact. In point of fact, Appellant never asserted that he could not have been at 1031 Highland Manor on the day in question because he was not arrested that day and he always gets arrested when he goes there. Rather, this is merely the fanciful twist the Commonwealth and the Majority place on Appellant's volunteering that he was often arrested when he visited

---

**3.** When the Commonwealth's case is contrasted to the brief defense offered by Appellant, it makes one wonder why a prosecutor might take what seems to be an unnecessary risk of reversal by attempting to introduce evidence that is generally deemed inadmissible. That the potential danger in introducing the evidence in question was blithely disregarded in the interests of securing a conviction can be seen in the following exchange that occurred at sidebar regarding the admissibility of the evidence in question: "Mr. Robinson (defense attorney): Your Honor, I'm concerned that if she's allowed to do what she wants to do it will constitute reversible error. Ms. DeBernardo: I'll take my chances."

1031 Highland Manor. While conceivably this premise could have been inferred from Appellant's testimony, put in context Appellant's statements more realistically come across as the exasperated lamentations of an individual who has had some bad experiences when visiting the home of his children and ex-girlfriend. It is mostly speculation to assert that the jury may have been inclined to draw such an inference from the rather impulsive statements Appellant made that led to the introduction of his prior arrests. However, more importantly, when the overall circumstances of the cross-examination are considered it is clear that the entire alibi by negative inference theory has simply been proffered as an excuse to justify the admission of other-crimes evidence.

¶ 8 Assuming for a moment that Appellant's comments regarding his arrests could have conveyed the message imparted to them by the Majority, the flaw in the Majority's analysis is that, standing alone, the exposition that Appellant had other arrests and convictions arising from incidents occurring at 1031 Highland Manor in no way refuted the assertion that Appellant "was always arrested when he visited his children at 1031 Highland Manor." Indeed, highlighting that Appellant had been arrested at 1031 Highland Manor would only tend to corroborate Appellant's statements by showing that Appellant had, in fact, been arrested at 1031 Highland Manor previously. Divulging the arrests would refute the Majority's negatively inferred alibi premise only if it was shown that Appellant had been at 1031 Highland Manor many more times than the number of his arrests, which would require at least an attempt to determine how many times Appellant had visited 1031 Highland Manor during the time frame in question. Of course, such topic was not the focus of the questioning regarding Appellant's arrests at 1031 Highland Manor as the prosecutor never attempted to elicit how often Appellant visited there and contrast it to the number of arrests Appellant experienced.

¶ 9 Nor was the prosecutor satisfied with stopping at that point. Rather, the prosecutor delved into not only the specific charges leveled against Appellant, but also the conduct that occasioned the charges. Had the focus been only to dispel this fanciful alibi theory, all that would have been necessary was divulging the number of arrests and contrasting them to the approximate number of visits. There would have been no need to divulge either the specific charge leveled against Appellant or the conduct underlying the arrest. The fact that the prosecutor did not approach the cross-examination in this manner highlights the fact that this negatively inferred alibi theory has been offered only as facial justification for the real motive behind the questioning, the character assassination of Appellant. Clearly, it was not the point of the cross-examination as it took place.

¶ 10 Secondly, it was not even necessary to divulge Appellant's arrest record to accomplish the supposed goal of the cross-examination. In what could be regarded as proper cross-examination, prior to gaining permission to delve into the details of his arrests the Commonwealth was successful in getting Appellant to admit that he was not arrested every time he visited 1031 Highland Manor. On cross-examination Appellant admitted that if he gave his ex-girlfriend money for bills when he visited she might not call the police. Also, when asked if his assertion "actually wasn't true" Appellant countered by responding "I would say for the better part, . . ." The above responses were sufficient to expose Appellant's comments as frustrated exaggeration and should have been regarded as sufficient cross-examination of the rather cryptic negative alibi

theory, particularly when the well recognized prejudice of admitting other crimes evidence is considered.

¶ 11 In a similar fashion, the Majority's assessment that the Commonwealth was entitled to dispel Appellant's "untruthful assertion" represents a gross misunderstanding of the limitations of cross-examination for impeachment purposes. While Appellant indeed volunteered that he had been arrested at 1031 Highland Manor, this fact alone was an insufficient basis to allow the prosecutor to engage in the extensive cross-examination of these "other crimes" that occurred here. While impeachment of a witness is a well-recognized and defended trial tactic, the right to impeach a witness is not unfettered. The subject matter of impeachment, like all testimonial evidence, must be relevant to the cause in issue; impeachment as to collateral matters is not permitted. *Commonwealth v. Petrillo*, 341 Pa. 209, 19 A.2d 288 (1941), *Commonwealth v. Kesting*, 274 Pa.Super. 79, 417 A.2d 1262 (1979). As our Supreme Court explained long ago in *Commonwealth v. Petrillo*, 341 Pa. 209, 19 A.2d 288 (1941):

> There seems to be considerable misunderstanding of the rules of evidence relating to the contradiction of witnesses. No witness can be contradicted on everything he testifies to in order to "test his credibility." The pivotal issues in a trial cannot be "sidetracked" for the determination of whether or not a witness lied in making a statement about something which has no relationship to the case on trial. The purpose of trials is not to determine the ratings of witnesses for general veracity. A witness can be contradicted only on matters germane to the issue trying. There is no rule more firmly established than this: "No contradiction shall be permitted on collateral matters." Judge PARKER speaking for the Superior Court in *Ber-*

*liner v. Schoenberg*, 117 Pa. Superior Ct. 254, 258, 178 A. 330, said: "If it be conceded that the evidence offered was irrelevant, it was improper to attempt to impeach the plaintiff's veracity by the use of it." (Citing Greenleaf on Evidence & Pennsylvania appellate court cases.) See also *Hildeburn et al. v. Curran*, 65 Pa. 59, 1870 WL 8529. This collateral (or immaterial) matter cannot be contradicted whether it was brought out on cross-examination or whether it was "volunteered" by the witness either on direct or cross-examination: Wigmore on Evidence, 3rd ed., Vol. 3, page 672, sec. 1007.

The above principles were reaffirmed by our Supreme Court in *Commonwealth v. Burdell*, 380 Pa. 43, 110 A.2d 193, 197 (1954), where the Court stated:

> We are of opinion that there were other errors committed in the course of the trial here under review. The court admitted evidence, through a tape recording, of a conversation between defendant and Vergili while they were both confined in the State Police barracks at Butler. This conversation did not contain any admissions of guilt by defendant or any matters tending to establish such guilt, but the offer was merely for the purpose of contradicting testimony he had given on cross-examination in regard to purely collateral matters. It is well established that a witness cannot be contradicted on collateral matters to test credibility: *Hester v. The Commonwealth*, 85 Pa. 139, 157; *Commonwealth v. Petrillo*, 341 Pa. 209, 223, 224, 19 A.2d 288, 295; *Commonwealth v. Truitt [Peay]*, 369 Pa. 72, 80, 85 A.2d 425, 429. While it is true that counsel for defendant allowed the tape recording to be admitted the result was undoubtedly damaging to defendant because the conversation was marked by vulgar lan-

guage which naturally would prejudice the jury against him." *Commonwealth v. Burdell,* 380 Pa. 43, 110 A.2d 193, 197 (1955).

¶ 12 Moreover, this Court has stated:

Even as a test of credibility, as ruled by the trial judge, the Commonwealth could not contradict appellant's testimony. A witness can be contradicted only on matters germane to the issue. The test of the materiality of a fact elicited on cross-examination is whether the cross-examining party would have been entitled to prove it as a part of his own case. Even if, as claimed by the Commonwealth, appellant volunteered the statement respecting his dates with Elizabeth, the statement could not be contradicted. A witness cannot be contradicted on everything to which he testifies in order to test his credibility. These principles and the rules limiting tests of credibility were explained and applied in *Com. v. Petrillo,* 341 Pa. 209, 19 A.2d 288, and they govern this appeal."

*Commonwealth v. Graham,* 170 Pa.Super. 343, 85 A.2d 632, 634 (1952). (Emphasis added).

¶ 13 The above passages demonstrate two important principles, one, that cross-examination/impeachment must be limited to "relevant" matters and, two, that a voluntary statement of the witness/defendant, i.e., opening the door, does not change this general principle of law and allow the questioning to devolve into a free-for-all. This general principle was eloquently stated by the United States Court of Appeals for the District of Columbia Circuit in *U.S. v. Brown,* 921 F.2d 1304, 1307 (D.C.Cir. 1990) where the Court stated:

Even if defense counsel had opened the door by questioning Wilson about his notes and challenging his credibility, it does not follow that all subsequent evidence is admissible. As this court has long recognized: " 'Opening the door is one thing. But what comes through the door is another.' " *United States v. Winston,* 145 U.S.App. D.C. 67, 447 F.2d 1236, 1240 (D.C.Cir.1971). "Introduction of otherwise inadmissible evidence under shield of [curative admissibility] is permitted 'only to the extent necessary to remove any unfair prejudice which might otherwise have ensued from the original evidence.' " *Id.* (citation omitted); cf. [*U.S. v.*] *Whitworth,* 856 F.2d [1268] at 1285 [(9th Cir.1988)]; [*U.S. v.*] *Childs,* 598 F.2d [169] at 174 [(C.A.D.C. 1979)]. In this case, all that was at issue was Wilson's credibility. Thus, even if the defense did open the door, it only did so to the extent of admitting evidence that rehabilitated that credibility.

¶ 14 In the present case, neither Appellant's arrest and plea of guilty to the charges in question, nor the facts underlying those charges, were relevant to the matter at hand. The only matter of relevance to the present case was whether or not Appellant delivered cocaine to 1031 Highland Manor on March 1, 1999. Since Appellant testified that he did not deliver cocaine as alleged, his general credibility was put into issue; however, neither the particulars of his behavior that resulted in his arrest when he had visited 1031 Highland Manor nor the nature of his relationship with his ex-girlfriend bore any relevance to his general credibility. Thus, although Appellant, for unknown reasons, commented on being arrested at 1031 Highland Manor, it should have been treated as would have the volunteering of any other innocuous and irrelevant information during examination. That is, it should have been ignored and the questioning should have moved on to other, relevant, matters.

¶ 15 The Commonwealth and the Majority next postulate that by seemingly portraying himself as a "caring father who gets arrested every time he tries to see his kids," Appellant has put his "good character" at issue.[4] The problem with this argument is twofold: first the Majority and Commonwealth's characterization of Appellant's testimony is mostly inaccurate or fraught with the same fictional license seen in the fanciful alibi argument, and second, even if Appellant's characterization were accurate, it would not necessarily be the equivalent of placing his good character at issue for purposes of 42 Pa.C.S.A. § 5918.

¶ 16 In reality, when Appellant's testimony is closely scrutinized, Appellant hardly depicted himself as an innocent individual simply trying to see his children who was then unfairly arrested. Appellant clearly and candidly portrayed his relationship with his ex-girlfriend as stormy. Moreover, Appellant admitted that he was not welcome at his ex-girlfriend's apartment and that they often got into disputes when he was there, which sometimes resulted in his arrest. This is a far cry from the spin the Commonwealth placed on Ap-

pellant's testimony at trial and now currently places upon it on appeal.[5]

¶ 17 Additionally, an individual places his character at issue, thereby opening himself/herself to cross-examination on prior convictions, when he portrays himself/herself as possessing a peaceful, law abiding or non-violent character or offers evidence that he has a reputation for the same, in other words, when he asserts that he has a character wholly inconsistent with having committed the kind of crime charged. *See Commonwealth v. Fisher*, 559 Pa. 558, 741 A.2d 1234 (1999) (holding that, in a first-degree murder case, a defense witness testified that the defendant had a reputation of being kind and courteous and relating well with others while his counsel portrayed him as devoutly religious, a war hero and a model prisoner); *Commonwealth v. Trignani*, 334 Pa.Super. 526, 483 A.2d 862 (1984) (holding that, in a prosecution for attempted murder defendant who volunteered he had "never shot anyone in his life" could be cross-examined as to a robbery in which he shot a person); *Commonwealth v. Johnson*, 262 Pa.Super. 223, 396 A.2d 726 (1978) (holding that, a defendant who answered "no" when asked

---

**4.** The Commonwealth asserts: "The questioning of the Commonwealth relative to the prior convictions were (sic) done in order to dispel of a misleadingly flattering picture of Appellant as a law abiding citizen who was simply trying to see his children and who is the subject of unfair treatment by the police and the mother of the children."

**5.** Notably, the Commonwealth builds its case that Appellant contended he was merely a "law abiding citizen who was simply trying to see his children" and who was then being "converged" upon by the police—in other words, the grounds which supposedly justify the allowance of the cross-examination in question—by citing to answers to questions asked after the court had already ruled in the Commonwealth's favor on the matter and allowed the line of questioning. Further, the prosecutor essentially led Appellant to the answers she apparently believed justified the

line of questioning. Indeed, after being granted leave to inquire on the matter, the prosecutor had to ask three questions before getting Appellant to agree that he was doing "nothing else other than being there that causes you to be arrested." N.T., at p. 311–12. Moreover, the quoted portion in the above sentence was part of the prosecutor's question. In other words, the Commonwealth's justification for the line of questioning was certain responses to its own leading questions after being given a green light on the line of questioning—this is bootstrapping of the highest degree. Fairly read, prior to this point in time, Appellant's testimony, at best, only minimally reflects the tenor the Commonwealth ascribes to it, and the primary commentary that does support it was uttered after the Court had allowed the testimony at a sidebar conference.

by his own counsel whether he had been "arrested as a juvenile or otherwise" could be cross-examined as to having been arrested for aggravated assault).

¶ 18 In the cases cited above, the defendant was found to have placed his good character into issue for purposes of § 5918 after the defendant, a witness or the defendant's counsel made a rather specific assertion. In contrast, at no time did Appellant make an assertion to the effect that he had a reputation for law-abiding behavior, that he never broke the law or that he was a non-violent person. Instead, Appellant offered that he had been convicted of retail theft and acknowledged that he had been arrested for criminal trespass. Moreover, although Appellant asserted that the episodes occurred when he went to see his kids, he never asserted that he was completely innocent in the episodes. To the contrary, he acknowledged that his ex-girlfriend did not want him there, or that he was not allowed there, and that the encounters developed into "disputes" that resulted in visits by the police.

¶ 19 The Commonwealth's argument essentially spins Appellant's testimony a certain way—that Appellant was making himself out to be father-of-the-year—equates it with an assertion of "good character," and then asserts that it entitles them to introduce other, wholly irrelevant, convictions into evidence to contradict the impression he was creating. This argument strains reason and has dangerous and ominous implications. Query: if a criminal defendant testifies that he waited for the traffic light to change prior to crossing the street, or to proceed forward in his vehicle, will he subject himself to cross-examina-

tion of other crimes or bad acts because by so testifying he represented himself to be "law abiding?" To validate the Commonwealth's argument would be to allow the "exception to swallow the rule" and would have a severe chilling effect upon a criminal defendant's right to testify.[6]

¶ 20 In consideration of the above, it is clear that Appellant was improperly cross-examined as to other crimes that had absolutely no relevance to the current prosecution. Having reached this conclusion, the next query before us would be whether the allowance of the questioning was harmless. In this respect our Supreme Court stated in *Commonwealth v. Garcia*, 551 Pa. 616, 712 A.2d 746, 749 (1998):

Harmless error is present when the properly admitted evidence of guilt is so overwhelming and the prejudicial effect of the error is so insignificant by comparison that it is clear beyond a reasonable doubt that the error could not have contributed to the verdict.

In *Garcia*, the Supreme Court refused to find "harmless error" even though the error that occurred there was limited merely to the timing of the introduction of that evidence and did not involve the introduction of prejudicial testimony that should not have come in at all. Consequently, given the Supreme Court's definition of harmless error and its actions in *Garcia*, it is clear that we would be unable to conclude that the error here was harmless. The present case essentially turned upon credibility. Appellant was not arrested at the site of the alleged transaction. Indeed, he was not "arrested" for this transaction until several months later. His only

6. Our Supreme Court rejected a similar type of reaching argument in *Commonwealth v. Garcia*, 551 Pa. 616, 712 A.2d 746, 748 n. 4 (1998). There the Commonwealth argued that the defendant had placed his good character at issue by testifying, among other things, that he had moved from New York City because New York was violent and that his "first reaction to the presence of the victim and his friends inside the restaurant was to stay calm and do nothing because he was nothing like a gangster."

defense was that he was not present at 1031 Highland Manor on the day in question. Thus, his credibility was paramount to his defense. The introduction of other crimes evidence would have a natural effect of discrediting his testimony and lowering his esteem in the eyes of the jury despite the fact that the crimes admitted had nothing to do with the one he was on trial for. It goes right to the heart of the reasons for the prohibition. As such, I would be unable to conclude that the admission of the evidence was harmless. Consequently, I feel duty bound to dissent.