COMMONWEALTH of Pennsylvania

v.

**Malik HOOD, Appellant.**

Superior Court of Pennsylvania.

Argued Feb. 24, 2004.
Filed March 14, 2005.
Reargument Denied May 11, 2005.

Burton A. Rose, Philadelphia, for appellant.

Joan Weiner, Asst. Dist. Atty., and Hugh J. Burns, Jr., Asst. Dist. Atty., Philadelphia, for Com., appellee.

BEFORE: TODD, PANELLA, and JOHNSON, JJ.

OPINION BY PANELLA, J.:

¶ 1 This is an appeal by Malik Hood from the judgment of sentence entered on November 4, 2002, by the Honorable James A. Lineberger of the Court of Common Pleas of Philadelphia. Following a jury trial, Hood was convicted of first-degree murder [1] and violating the Uniform Firearms Act.[2] He was sentenced by Judge Lineberger to life in prison on the murder charge and one to two years consecutive sentences for each of two weapons violations. After an exhaustive review of the record, we affirm the judgment of sentence.

¶ 2 In his appeal, Hood presents three issues for our review:

1. Was the Appellant deprived of the right to pretrial discovery and his federal and state constitutional right of counsel where the Commonwealth was permitted to conceal from his trial attorney the identity and statements of key Commonwealth witnesses and precluded trial counsel for the Appellant from participating in a hearing at which time the lower court ruled that this information would be kept from counsel for the Appellant until time of trial?

2. Did the lower court err in allowing the Commonwealth to present testimony

---

1. 18 PA. CONS. STAT. ANN. § 2502.

2. 18 PA. CONS. STAT. ANN. § 6106 & 6108.

regarding the content of police radio calls made to 911 by unidentified witnesses which incriminated the Appellant where there was no independent proof that these declarants actually witnessed the shooting?

3. Did the lower court err in refusing to grant relief due to prosecutorial misconduct where the cross-examination of the defense alibi witness revealed that the Appellant had been in prison subsequent to this offense but prior to his arrest?

Brief for Appellant at 3. The standard of review for each of these issues is whether the trial court abused its discretion. " 'Discretion is abused when the course pursued [by the trial court] represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias, or ill will.' " *Commonwealth v. Smith,* 545 Pa. 487, 491, 681 A.2d 1288, 1290 (1996) (*quoting Coker v. S.M. Flickinger Co.,* 533 Pa. 441, 448, 625 A.2d 1181, 1185 (1993)).

■ ¶ 3 We are forced to review these issues without the benefit of a Rule 1925(a) opinion from the court below. The trial judge merely ordered the court administrative officer to forward the certified record to our Court without an opinion, stating that the reasons for his decisions appear of record. *See* Letter addressed to Susan Carmody, Court Administrative Officer, filed July 18, 2003. The Rules of Appellate Procedure make the filing of a 1925(a) opinion mandatory and this opinion must set forth the reasons for the rulings of the trial judge or must specify in writing the place in the record where the reasons may be found. Pa.R.A.P., Rule 1925(a), 42 Pa. Cons. Stat. Ann. The purpose of this rule is to provide the appellate court with a statement of reasons for the order so entered in order to permit effective and meaningful review of the lower court decisions. *Commonwealth v. Benchoff,* 700 A.2d 1289 (Pa.Super.1997), *reargument denied.* However, the lack of a Rule 1925(a) opinion is not always fatal to our review, because we can look to the record to ascertain the reasons for the order. *See Cooke v. Equitable Life Assurance Society,* 723 A.2d 723, 727 (Pa.Super.1999).

■ ¶ 4 In this case, the trial judge did not provide us with a 1925(a) opinion or direct us to the places in the record where he states the reasons for his decisions. "Ordinarily, the remedy for non-compliance with the Pa.R.A.P. 1925(a) is a remand to the trial court with directions that an opinion be prepared and returned to the appellate court." *Gibbs v. Herman,* 714 A.2d 432, 435 (Pa.Super.1998) (internal quotations and citations omitted). Although we do not approve or sanction the trial court's failure to comply with Rule 1925(a), our review of the record, in particular, the notes of testimony from the hearing held on August 22, 2000, and the trial transcript, adequately apprise us of the trial court's reasoning in relation to the three issues raised herein. Therefore, we decline to delay this case further by remanding for the preparation of a 1925(a) opinion, and proceed to review the merits of Appellant's claims. *See Commonwealth v. Griffin,* 785 A.2d 501, 504 (Pa.Super.2001).

¶ 5 Testimony at trial established the disturbing murder of an innocent victim who tried to stop drug dealing in his neighborhood. On November 24, 1997, the victim, Anthony Taylor, was seen engaged in a heated argument with Hood standing outside of Taylor's residence at 229 Creighton Street. The argument focused on Taylor's anger over Hood's use of Taylor's property as a headquarters for

Hood's drug business. At some point, Taylor entered a neighbor's house and called 911 because "there was going to be some trouble because the kids would not get out of his house". N.T. Trial, 10/28/2002, at 73.

¶ 6 After calling the police, Taylor returned to the street and again argued with Hood outside his residence. *Id.* at 141. Hood pulled out a gun and fired it directly at Taylor, wounding him in the heart, liver, leg, and stomach. N.T. Trial, 10/30/2002, at 13–16. The police immediately canvassed the neighborhood for witnesses but no one came forward. N.T. Trial, 10/29/2002, at 119–20.

¶ 7 In August 1999, the police decided to go to the home of each person who had called 911 on the night of the murder. N.T. Trial, 10/29/2002, at 132. They located two eyewitnesses, Cuddlene Ross and Lisa Wragg. *Id.* at 132, 139. Ms. Ross testified at trial that she saw Hood pull a gun from his waistband and gesture with it, and then she heard a shot and saw the victim fall.[3] N.T. Trial, 10/28/2002, at 186. She ran inside to call 911 and as she was dialing, she heard several more shots. *Id.*, at 137–52, 180–88.

¶ 8 Ms. Wragg, who lived nearby at the time of the shooting, initially told police that Hood was the man she saw shoot and kill Taylor, and she positively identified him by way of a photo array. N.T. Trial, 10/29/2002, at 26–32. She also provided the police with a written statement in which she answered with the name "Malik" to the question "Do you know who shot and killed Anthony Taylor on 11/24/97?" At trial, she testified that Taylor was shot by an unidentified individual in a car during a drive-by shooting, however, she acknowledged her earlier written and oral statements to the police, and gave no explanation for the inconsistencies with her trial testimony. *Id.*, at 31–33 & 47–50. She also testified that her mother, Pauline Wragg, had made a telephone call to 911 from the house after the shooting. *Id.* at 50.

¶ 9 During additional interviews with Ross and Wragg, the Commonwealth developed information to support a protective order to keep the identities of these witnesses, as well as their statements, from being disclosed prior to trial because the witnesses were fearful of retaliatory measures. The Honorable Renee Cardwell Hughes granted the Commonwealth's motion for a protective order after an *ex parte* hearing on August 22, 2000. N.T. Protective Order Hearing, 08/22/2000, at 16.

## I. *Nondisclosure of Eyewitnesses*

■ ¶ 10 With respect to the discovery of eyewitnesses, there is no requirement that identifying information of eyewitnesses be disclosed by the Commonwealth under the mandatory disclosure provisions of Rule 573. Pa.R.Crim. P., Rule 573, 42 Pa. Cons. Stat. Ann. (West 2004).[4] Rule 305(B)(2)(a), howev-

---

**3.** It was well founded in the evidence that although there were many witnesses to the shooting, very few were willing to come forward and cooperate with the police. The cooperation of Cuddlene Ross, coupled with the understandable fear that ran through her neighborhood, was an admirable example of bravery and social consciousness.

**4.** Rule 573(B)(1)(d) requires the disclosure of "circumstances and results of any identifica-

tion of the defendant by voice, photograph, or in person identification...." Pa.R.Crim.P., Rule 573, 42 Pa. Cons. Stat. Ann. (West 2004). The *Comment* following the rule makes it clear that the reference to "identification" in subsection (B)(1)(d) refers to an exhibition of the defendant to a witness for purposes of an in-court identification, such as "a line-up, stand-up, show-up, one-on-one confrontation, one-way mirror, *etc.*"

er, permits the discovery, at the discretion of the trial court, of the names and addresses of eyewitnesses. Pa.R.Crim. P., Rule 573(B)(2)(a), 42 PA. CONS. STAT. ANN. (West 2004); see *Commonwealth v. Jones,* 542 Pa. 464, 668 A.2d 491 (1995), *cert. denied,* 519 U.S. 826, 117 S.Ct. 89, 136 L.Ed.2d 45 (1996).

¶ 11 Rule 573 allows a party to seek a protective order restricting the disclosure of certain information. Pa.R.Crim.P., Rule 573(F), 42 PA. CONS. STAT. ANN.[5] In this case, the Commonwealth appropriately filed for such a protective order, and following an *ex parte* hearing, the trial court granted the protective order. N.T. Protective Order Hearing, 08/22/2000 at 16 (Cardwell Hughes, J.). Our Supreme Court has condoned the issuance of such a protective order following an *ex parte* hearing. *Commonwealth v. Brown,* 544 Pa. 406, 421–22, 676 A.2d 1178, 1185 (1996), *cert. denied,* 519 U.S. 1043, 117 S.Ct. 614, 136 L.Ed.2d 538 (1996). In *Brown,* our Supreme Court noted that a prosecutor may not unilaterally withhold the identity of an eyewitness, but instead may request a protective order upon proper motion to the trial court. *Id.* The Court went on to state:

> Appellant does not assert that the Commonwealth failed to make a sufficient showing of the need for a protective order in this case. Nor was the Appellant prejudiced by the disclosure of the identity of the eyewitness at the time of trial because defense counsel was given a continuance to prepare for his testimony. The trial judge did not abuse his discretion in denying the request for a mistrial.

*Id.,* at 422, 676 A.2d at 1185. *See also Commonwealth v. Bonacurso,* 500 Pa. 247, 252, 455 A.2d 1175, 1178 (Pa.1983), *cert. denied,* 462 U.S. 1120, 103 S.Ct. 3090, 77 L.Ed.2d 1350 (1983).

¶ 12 In the case *sub judice,* Hood argues that he was denied his right to counsel because the hearing for the protective order was done *ex parte.* Brief for Appellant at 17. We note at the outset that allowing the presence of defendant and defense counsel at the protective order hearing would have defeated the purpose of providing protection for these witnesses. Further, the subject of the hearing was collateral to the guilt or innocence of Hood as it involved only the question of whether these witnesses were fearful of Hood.

■ ¶ 13 A defendant has a right to counsel at every critical stage of a criminal proceeding where the substantive rights of the accused may be affected. *Commonwealth v. Johnson,* 574 Pa. 5, 13–15, 828 A.2d 1009, 1014 (2003) (holding that the right to counsel attaches during reiterative jury instructions). A criminal proceeding is critical when certain legal rights may be lost if not exercised at that stage. *Mempa v. Rhay,* 389 U.S. 128, 135, 88 S.Ct. 254, 19 L.Ed.2d 336 (1967); *Commonwealth v. Holzer,* 480 Pa. 93, 105, 389 A.2d 101, 107 (1978).

¶ 14 Hood lost no legal rights by not having the names of the witnesses disclosed to him during the discovery stage as he was afforded full confrontation with these witnesses at trial who were subjected to a full and vigorous cross-examination. N.T. Trial, 10/28/2002, at 158–97; N.T. Trial, 10/29/2002, at 35–46. Further, Hood was given all the time he requested to prepare for these witnesses. N.T. Trial, 10/28/2002, at 131–32. The *ex parte* hear-

---

**5.** "Upon a sufficient showing, the court may at any time order that the discovery or inspection be denied, restricted, or deferred, or make such other order as is appropriate." Pa.R.Crim.P., Rule 573(F), 42 PA. CONS. STAT. ANN.

ing was therefore not a critical stage of the proceeding against Hood.

■ ¶ 15 Moreover, a discovery violation does not automatically warrant relief in the form of a new trial. *Commonwealth v. Jones,* 542 Pa. 464, 668 A.2d 491, 513 (1995), *cert. denied,* 519 U.S. 826, 117 S.Ct. 89, 136 L.Ed.2d 45 (1996). "A defendant seeking relief from a discovery violation must demonstrate prejudice .... A violation of discovery **'does not automatically entitle ... (a defendant) to a new trial.'** *Commonwealth v. Causey,* 833 A.2d 165, 171 (Pa.Super.2003), *appeal denied,* 577 Pa. 732, 848 A.2d 927 (2004) (emphasis in original) (*citing Commonwealth v. Jones,* 542 Pa. 464, 509, 668 A.2d 491, 513 (1995)).

¶ 16 Hood has not developed how a more timely disclosure would have affected his trial strategy or how he was otherwise prejudiced by the nondisclosure of the identities of the witnesses. Nor has he demonstrated the appropriate degree of prejudice required under Rule 573 to allow us to find that Judge Cardwell Hughes abused her discretion in granting the protective order. *Id.* Accordingly, we find no error on the part of the trial court in denying Hood relief on this basis.

### II. *Admissibility of 911 Tapes*

■ ¶ 17 Hood next claims that the trial judge erred in admitting the 911 tape recordings which identified Hood as "the perpetrator of these offenses." Brief for Appellant, at 22. Hood seizes upon *Commonwealth v. Upshur,* 764 A.2d 69, 76 (Pa.Super.2000) (en banc), *appeal dismissed as improvidently granted,* 566 Pa. 589, 782 A.2d 538 (2001), in support of his argument that these tapes were inadmissible hearsay as they did not satisfy certain criteria of the excited utterance exception to the hearsay rule. In reply, the Commonwealth first contends that the tapes were properly admitted as excited utterances, and alternatively relies on the present sense impression exception to justify their admission into evidence.

■ ¶ 18 The admissibility of evidence is solely within the discretion of the trial court and will be reversed only if the trial court has abused its discretion. *Commonwealth v. Seilhamer,* 862 A.2d 1263, 1270 (Pa.Super.2004). Hearsay is *per se* inadmissible except as provided in the Rules of Evidence. Pa.R.E., Rule 802, 42 PA. CONS. STAT. ANN. When a hearsay statement is offered for a purpose other than proving the truth of its contents, it is not hearsay and is not excludable under the hearsay rule. *Commonwealth v. Cunningham,* 805 A.2d 566, 572 (Pa.Super.2002), *appeal denied,* 573 Pa. 663, 820 A.2d 703 (2003).

■ ¶ 19 An excited utterance, as an exception to the hearsay rule, is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Pa.R.E., Rule 803(2), 42 PA. CONS. STAT. ANN. The Comment to this exception states that "[t]his exception has a more narrow base than the exception for a present sense impression, because it requires an event or condition that is *startling.*" *Id.,* Comment–1998 (emphasis in original). Further, "an excited utterance (1) need not describe ... the startling event ...; it need only *relate* to it, and (2) need not be made contemporaneously with, or immediately after, the startling event. *Id.* (emphasis in original); *see also Commonwealth v. Carmody,* 799 A.2d 143 (Pa.Super.2002).

¶ 20 With respect to excited utterances by unidentified bystanders, the law in Pennsylvania has evolved to add an additional proof requirement for admissibility. In order to assure that an unidentified

bystander actually witnessed an event which is relevant at the time of trial, the Pennsylvania Supreme Court has held that that it is incumbent upon the party seeking the admission of the out-of-court statement to demonstrate by the use of *"other corroborating evidence"* that the declarant actually viewed the event "of which he speaks." *Carney v. Pennsylvania Railroad Co.,* 428 Pa. 489, 496, 240 A.2d 71, 75 (1968). In *Upshur,* the Superior Court, relying upon *Carney,* ruled that it was reversible error to admit this type of statement pursuant to the *res gestae* exception when "the out-of-court assertion by the unidentified bystander did not demonstrate that the declarant actually viewed the event of which he spoke". *Upshur,* 764 A.2d at 75 (citing *Carney* ); *see also Williamson v. Philadelphia Transportation Co.,* 244 Pa.Super. 492, 368 A.2d 1292 (1976).

¶ 21 Both the *Carney* and *Upshur* cases referred to the *res gestae* exception to the rule against hearsay. *Res gestae* was a common law hearsay exception that included, *inter alia,* both excited utterances and present sense impressions. *See Commonwealth v. Pronkoskie,* 477 Pa. 132, 383 A.2d 858 (1978).

¶ 22 In the case presently before us, the initial 911 call came in at 5:34 P.M. on November 24, 1997. N.T. Trial, 10/29/2002, at 58. This call was made by the victim. N.T. Trial, 10/28/2002, 73–74. Between 5:40 P.M. and 5:45 P.M., there were at least ten different calls made to 911 reporting a gun shot on the same street. N.T. Trial, 10/29/2002, at 52–109. Two of these callers identified the shooter as a man named "Malik." *Id.,* at 80, 87. A tape recording of these calls was played for the jury. *Id.,* at 63.

¶ 23 The first call reporting the shooting on the 911 tape was logged in at 5:40:16. Trial Exhibit C–7. The first call present-

ed by the Commonwealth that identified "Malik" as the shooter was logged in at 5:41:20. *Id.* In relevant part, the transcript reveals the following conversation:

Caller: 200 block of . . . 200 block of Creighton [S]treet. A man is down. Three bullet wounds, please

Radio: Okay, hold on. Don't hang up. Listen

Caller: Yes. Please send someone immediately. Send an ambulance please

Radio: Listen. Don't hang up

Caller: Oh my God. He's (unreadable) These guys..they shooting out here like crazy

Radio: Miss. Do you see

Caller: Send some police officers out

Radio: Listen. Did you see the person with the gun?

Caller: Yes I did . . . (unreadable). . . shooter. Yes I did see it

Radio: What he [sic] look like?

Caller: He's a black guy. The one who..he had a black coat. He's [sic] name is Malik. That's the one who shot

*Id.*

¶ 24 The second call presented by the Commonwealth that identified "Malik" as the shooter was logged in at 5:43:35:

Radio: Philadelphia

Caller: Yeah..I just....yeah I just called for the 200 block of 52nd...200 block of Creighton street. Can someone send the ambulance this guy's bleeding?

Radio: Yes

Caller: Yeah okay.

Radio: We have rescue enroute

Caller: Cause no one has arrived here. He's been shot three times.

Radio: Okay. Did you see the shooter?

Caller: Yes I did

Radio: Okay. Did you give. Did you say what he looked like?

Caller: Yes. He's a..he's a guy who sells drugs on this street. I've been talking to these people in this neighborhood

Radio: Alright. Wait a minute, honey

Caller: His name is Malik. I just sh...I saw him shoot, but I can't say...I can't testify because I don't want to get any...cause I liver here

Radio: Okay. You be careful and is the guy the black jacket on?

Caller: Yes...and he has a black jacket. His name is Malik. He's the one who shot him

Radio: Okay..alright

Caller: I just wanted the cops to come out (unreadable) cause these...these I live on this street

Radio: I understand

Caller: I just got a new door. We just missed it by an inch.

Radio: Thank God

Caller: Alright Miss. I don't believe this

Radio: I know

Caller: You see these drugs are so bad..we..we have...we have the neighborhood watch. We talk about it...the police. I've called the police everyday about these narcotics. They're selling drugs right...right across the street from me and no one never comes

*Id.*

¶ 25 The Commonwealth initially argues that because the declarants in the 911 tape stated that they viewed the shooting, sufficient independent corroborating evidence was provided. However, that argument has been rejected by an *en banc* panel of this Court. *Upshur*, 764 A.2d at 76–77. In *Upshur*, when considering whether a statement qualified as an excited utterance, an *en banc* panel of this Court held that the declarant's assertion that he witnessed the event was "insufficient to establish the trustworthiness of the out-of-court statement." *Id.* As such, we cannot accept the Commonwealth's argument. *Commonwealth v. Bucknor*, 441 Pa.Super. 441, 657 A.2d 1005, 1007 n. 1 (1995), *appeal denied*, 542 Pa. 640, 666 A.2d 1050 (1995) (A three judge panel cannot overrule *en banc* decisions of this Court).

¶ 26 However, Pa.R.E. Rule 803(1), the present sense impression exception to the rule against hearsay, does not explicitly adopt the *Carney* rule, and no case subsequent to codification has done so either. Pa.R.E., Rule 803(1), 42 Pa. Cons. Stat. Ann. The present sense impression exception, regardless of the availability of the declarant to testify at trial, allows the admission of "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter ...." Pa.R.E., Rule 803(1), 42 Pa. Cons. Stat. Ann. The observation must be made at the time of the event or shortly thereafter, making it unlikely that the declarant had the opportunity to form an intent to misstate his observation. Consequently, the trustworthiness of the statement depends upon the timing of the declaration. *Commonwealth v. Gray*, 867 A.2d 560, 570 (Pa.Super.2005).

¶ 27 The rationale for this exception is that the "[r]elative immediacy of the declaration insures that there will have been little opportunity for reflection or calculated misstatement." *Commonwealth v. Coleman*, 458 Pa. 112, 116, 326 A.2d 387, 389 (1974). "In addition, the present sense impression does not require that the comments be made to another person also present at the scene, but may be made over the telephone." *Cunningham*, 805 A.2d at 573.

¶ 28 We note, however, that the same issue of corroboration addressed under the excited utterance exception may relate to the present sense impression exception. *See* West's Pennsylvania Evidence, Packel & Poulin, 1998 and 2003. This supposition is drawn from the fact that *Carney's* holding referred to the *res gestae* hearsay exception. Before the codification of the Pennsylvania Rules of Evidence, the *res gestae* exception included, as noted above, both excited utterances and present sense impressions. *See Commonwealth v. Pronkoskie*, 477 Pa. 132, 383 A.2d 858 (1978). Moreover, Rule 803(1) restricts the present sense exception to statements made while the declarant is "perceiving" the event. Therefore, corroborative proof that the declarant actually viewed the event naturally flows to this exception as well. However, under either exception, we find that the evidence adduced at trial contained sufficient "other corroborating evidence" to justify its admission.

¶ 29 The description of the shooting event, including specifics such as day, time, location, and the manner of the shooting itself, provided by the callers mirrored the account testified to by Cuddlene Ross, as well as the written statement given by Lisa Wragg. Because the exact times of the 911 calls were documented, it is easily verifiable from the record that the calls were made almost contemporaneously with the shooting, adding credence to the contention that there was not enough time to discuss the matter and have a third party call 911 instead of the actual witness. N.T. Trial, 10/29/2002, at 55–67; Trial Exhibit C–7. Additionally, Cuddlene Ross testified that there were many other people from the immediate neighborhood outside at the time of the shooting. N.T.

Trial, 10/28/2002, at 154, 161–165. Unlike the situation in *Upshur*, there is sufficient corroborating evidence that the statements of the two 911 callers in issue were made by declarants who had actually witnessed the shooting.

¶ 30 Lastly, Hood has forwarded a copy of *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), by way of a post-submission communication to this Court pursuant to Pa.R.A.P., Rule 2501(b), claiming that it is relevant to his argument against the 911 tapes. The Commonwealth objects to this submission, and in particular, argues that Hood's submission does not qualify under Rule 2501(b). Furthermore, the Commonwealth argues that trial counsel failed to preserve this issue in his pre-trial motion *in limine*.

¶ 31 It is well established in Pennsylvania that "in order for a new rule of law to apply retroactively to a case pending on direct appeal, the issue had to be preserved at all stages of adjudication up to and including the direct appeal." *Commonwealth v. Gray*, 867 A.2d 560, 574 (Pa.Super.2005) (internal quotations and citations omitted). We recognize that *Crawford* advanced a new rule of law insofar as it overruled *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). Our review of the record, however, reveals that Hood failed to object to the Commonwealth's introduction of the out-of-court statements as a violation of his right to confront his accusers.[6] Accordingly, we find Hood has waived the issue for appellate review, and we therefore affirm the trial court's ruling that the 911 tapes were admissible.

---

6. Hood has also waived this issue by failing to include it in his Statement of Questions Involved. "[O]rdinarily no point will be considered which is not set forth in the statement of questions involved or suggested thereby." Pa.R.A.P., Rule 2116(a), 42 PA. CONS. STAT. ANN.

## III. *Prosecutorial Misconduct*

■ ¶ 32 Hood's final issue on appeal is that the trial court abused its discretion in permitting the jury to learn that appellant was incarcerated during the period March 1998 to April 1999. Brief for Appellant, at 29. The Commonwealth argues that its cross-examination eliciting this fact was proper.

■ ¶ 33 Evidence implying other crimes may be introduced when the evidence has a proper evidentiary purpose and is not used merely to demonstrate that the defendant is a person of bad character with a propensity to commit crime. *Commonwealth v. Gwynn*, 555 Pa. 86, 105, 723 A.2d 143, 152 (1998), *cert. denied*, 528 U.S. 969, 120 S.Ct. 410, 145 L.Ed.2d 320 (1999). It is black letter law that the Commonwealth may impeach a defendant's credibility with reference to prior crimes where the defense opens the door. *Commonwealth v. Days*, 784 A.2d 817, 821 (Pa.Super.2001). "[The defendant] is not insulated from being discredited about the factual accuracy simply because that proof involves other crimes." *Id.*

¶ 34 In this case, the defense opened the door by putting Hood's girlfriend, Heather Oliver, on the stand as an alibi witness. She testified Hood was with her the day of the shooting. N.T. Trial, 10/30/2002, at 106. She further testified on direct that Hood lived with his mother during the period March 1998 to April 1999. *Id.*, at 114. She never mentioned that Hood had been incarcerated during the same period of time.

■ ¶ 35 Understandably, the Commonwealth attempted to impeach Oliver's credibility. To this end, the Commonwealth asked her if she ever visited Hood in prison during the period March 1998 to April 1999. *Id.*, at 141. This line of cross-examination clearly attacked Oliver's cred-

ibility. Therefore, it was permissible cross-examination. It was admissible because it was not offered to show the bad character of Hood, but rather, to prove that the testimony of Oliver was not truthful. It is well-established that admission of such evidence is within the sound discretion of the trial court and will be reversed only upon a showing of an abuse of that discretion. *Commonwealth v. Stallworth*, 566 Pa. 349, 364, 781 A.2d 110, 118 (2001). We find no such abuse of discretion.

■ ¶ 36 Furthermore, a new trial is only granted where the unavoidable effect of the prosecutor's conduct so prejudiced the jurors, forming in their minds such fixed bias and hostility towards the defendant that they were incapable of weighing the evidence and rendering a true verdict. *Commonwealth v. Spotz*, 562 Pa. 498, 542, 756 A.2d 1139, 1163 (2000), *cert. denied*, 532 U.S. 932, 121 S.Ct. 1381, 149 L.Ed.2d 307 (2001). We first note that the Assistant District Attorney only inquired if the witness visited Hood in a prison during the period of March 1998 to April 1999. N.T. Trial, 10/30/2002, at 141. The record reflects that this question was only asked *once* in the presence of the jury. *Id.*, at 141. Further, we note that the ADA did not inquire as to the reasons why Hood may have been incarcerated during that time period. *Id.*, at 150–162.

■ ¶ 37 Any prejudicial effect was also lessened because there was extensive admissible evidence throughout the trial that implicated Hood in illegal drug activity. Finally, the trial court instructed the jury not to use the fact of prior incarceration as evidence of Hood's guilt on the instant charges because the information was introduced solely as evidence of the factual development of the case. N.T. Trial, 10/31/2002, at 105–106. A jury is presumed to follow the court's instructions. *Commonwealth v. Johnson*, 542 Pa. 384,

668 A.2d 97, 105 (1995), *cert. denied,* 519 U.S. 827, 117 S.Ct. 90, 136 L.Ed.2d 46 (1996). No error has been demonstrated and therefore no relief is warranted.

¶ 38 Judgment of sentence affirmed.