J-S13003-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| STEPHEN BARRY-GIBBONS, | |
| Appellant | No. 11 WDA 2018 |

Appeal from the Judgment of Sentence Entered September 29, 2017
In the Court of Common Pleas of Erie County
Criminal Division at No(s): CP-02-CR-0003148-2016

BEFORE:  BENDER, P.J.E., OTT, J., and STRASSBURGER, J.[*]

MEMORANDUM BY BENDER, P.J.E.:                **FILED JUNE 17, 2019**

Appellant, Stephen Barry-Gibbons, appeals from the judgment of sentence of 27½-55 years' imprisonment, imposed after he was convicted of criminal conspiracy to commit possession with the intent to deliver and numerous other offenses.  We affirm in part and vacate in part.

We adopt Appellant's comprehensive statement of the case:[1]

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] The Commonwealth's brief does not contain a counter-statement of the case, so we assume it substantially agrees with Appellant's rendition of the factual and procedural history of this matter.  *See* Pa.R.A.P. 2112 ("The brief of the appellee … need contain only a summary of argument and the complete argument for [the] appellee, and may also include counter-statements of any of the matters required in the appellant's brief as stated in Pa.R.A.P. 2111(a). Unless the appellee does so, or the brief of the appellee otherwise challenges the matters set forth in the appellant's brief, it will be assumed the appellee is satisfied with them, or with such parts of them as remain unchallenged.").

The Commonwealth charged Appellant, by criminal information, with one count, respectively, of criminal conspiracy to commit possession with the intent to deliver, 18 Pa.C.S.[] § 903[;] possession with the intent to deliver (93 grams of heroin), 35 P.S. § 780-113(a)(30)[;] possession with [the] intent to deliver (763 grams of cocaine), 35 P.S. § 780-113(a)(30)[;] possession of drug paraphernalia, 35 P.S. § 780-113(a)(32)[;] possession of a controlled substance (93 grams of heroin), 35 P.S. § 780-113(a)(16)[;] possession of a controlled substance (763 grams of cocaine), 35 P.S. § 780-113(a)(16)[;] persons not to possess firearms, 18 Pa.C.S.[] § 6105(c)(2)[;] and receiving stolen property, 18 Pa.C.S.[] § 3925(a). These charges stemmed from allegations that the City of Erie Police recovered five baggies of suspected heroin weighting [*sic*] 93 grams, ten baggies of suspected cocaine weighing 763 grams, stolen handguns, a digital scale, a hydraulic press, plastic baggies and a manual press from Appellant's residence at 1055 West 30th Street, Upstairs, Erie, Pennsylvania on May 19, 2016[,] after the execution of a search warrant.

On February 3, 2017, Appellant filed an Omnibus Pre-Trial Motion, in which Appellant asked … the trial court to suppress the evidence seized, as [violating] the Federal and State Constitutions, due to a lack of probable cause to obtain a warrant. On April 13, 2017, Appellant filed a Supplemental Omnibus Pre-Trial Motion. The trial court held a suppression hearing, and denied Appellant's motions.

On July 26, 201[7], the Commonwealth filed a motion to introduce evidence of Appellant's prior bad acts under Pa.R.E. 404(b). Specifically, the Commonwealth sought to introduce the police's observation of an alleged drug transaction between Appellant and Ashley Dumas on the day that the police obtained the warrant. Ms. Dumas gave a video-recorded statement to police, which resulted in Appellant being charged for this separate transaction at Docket 3146 of 2016; however, Ms. Dumas died of a drug overdose prior to trial. The Commonwealth sought to admit testimony that the officers observed Appellant leave 1055 West 30th Street and travel to a nearby area where the female entered the passenger seat. Also, that upon exiting the vehicle, the female

was found in possession of heroin, and the officers observed Appellant immediately returning to 1055 West 30th Street.[2]

The case proceeded to trial against Appellant and his co-defendant, Franzora Smith, and the Commonwealth presented the testimony of Andre Collins. N.T. Trial, 8/14/17, at 31. Collins testified that his parents own rental properties, including 1055 West 30th Street, Erie, Pennsylvania, and he helps manage those properties. *Id.* at 31-[3]2. Collins testified that Appellant signed a lease for this property in July of 2015. *Id.* at 32-[3]3. The original term of the lease was six months, but it became month to month. *Id.* at 34. Collins testified that Appellant was current on his rent through May of 2016, but later clarified that Appellant had paid through April of 2016. *Id.* at 34, 48. Collins did not know if anyone else resided there with Appellant. *Id.* at 34. Collins primarily collected the rent from Appellant, but a young lady sometimes paid him instead. *Id.* at 34-[3]5. Appellant never notified Collins that the woman lived there, which the lease required. *Id.* at 35.

On cross-examination, Collins admitted that Appellant had provided him with thirty days written notice of his intent to terminate in March or April of 2016. *Id.* at 37-[3]8. Collins admitted that Appellant did have other people pay the rent on his behalf when Appellant was not in the area. *Id.* at 38. Collins also stated that he saw two or three other individuals going into or out of Appellant's apartment two weeks prior to the police's search of the apartment. *Id.* at 41-[4]2, 49. Appellant was not with them. *Id.* at 49. He further testified that he received complaints that other individuals that he had evicted from another property were entering Appellant's second story apartment without authorization. *Id.* at 45. These individuals were accessing that apartment with keys. *Id.* at 46.

Next, Leiah Smith testified that, in May of 2016, she was in a relationship with Appellant[,] and was arrested with him and Mr. Smith on the same charges. *Id.* at 51. Ms. Smith testified that the Commonwealth allowed her to go into the [accelerated rehabilitative disposition (ARD)] program in exchange for her testimony. *Id.* at 52. Ms. Smith testified that she met Appellant two months prior in Detroit, Michigan[,] and had never been to

_____

2 The trial court granted the Commonwealth's request to introduce this prior bad acts evidence. *See* Appellant's Brief at 43; Commonwealth's Brief at 9.

Erie prior to May of 2016. *Id.* She arrived in Erie with Appellant two or three days prior to her arrest. *Id.* at 53. Appellant told Ms. Smith that he operated a number of different businesses, including cleaning and transportation services and an online business, and had a dealer's license for automobiles. *Id.* at 54. She came to Erie to help him drive a car that he had purchased back to Detroit and to meet his mother. *Id.* Appellant's cousin, Yusef, came with them. *Id.* at 53.

When they arrived in Erie, they went to the apartment on 1055 West 30th Street, and Mr. Smith was there. *Id.* at 55. She stayed overnight there throughout her stay and never saw drugs in the house. *Id.* at 56. However, she did see a gun and a rifle. *Id.* On May 19, 2016, the day of the arrest, Appellant told her that they were going to pick up the car, but would first stop at his mother's to do laundry. *Id.* at 57. Ms. Smith packed all of her belongings into the trunk of Appellant's rental car, including her purse, and got into the front passenger seat. *Id.* They stopped at CVS because Appellant had to do a money transfer. *Id.* at 58.

During her time in Erie, she did notice that Appellant had a large sum of cash, but did not know the amount. *Id.* at 59. She admitted that, upon their arrest, the police discovered $14,000.00 in her purse in the trunk of the car, but testified that she did not put the money there. *Id.* She testified that Appellant had access to the trunk after she put the purse there. *Id.*

On cross-examination, Ms. Smith explained that her trip to Erie with Appellant did not raise any red flags to her. *Id.* at 62. She believed Appellant needed a sum of money to purchase the car. *Id.* When she was arrested, some of her personal toiletries were at 1055 West 30th Street. *Id.* at 63. She testified that Yusuf also stayed with them at that apartment. *Id.* at 64. Appellant stayed with them one night in the apartment and stayed elsewhere another night. *Id.* at 65. She could not recall if Mr. Smith stayed there or if he was merely in and out. *Id.* She recalled two or three other people visiting the apartment while she stayed there. *Id.* at 66. She heard female voices in the apartment when she stayed there. *Id.* at 77. Ms. Smith never saw drugs or guns in the vehicle during her trip. *Id.* at 66. She first saw a gun leaning up against the wall in the apartment on the day she was arrested, but never saw Appellant or Mr. Smith in possession of that gun. *Id.* at 68, 72. During cross, she testified she only saw one gun. *Id.* at 74. Ms. Smith admitted that she sat in jail for three months

and was only released when she agreed to testify for the Commonwealth. *Id.* at 71.

[Sergeant] Michael Chodubski from the Erie Police Department testified that he conducted surveillance on 1055 West 30th Street and developed two persons of interest from his observations, Juan and J.B. *Id.* at 83. [Sergeant] Chodubski identified J.B. in a photograph exiting the second story apartment carrying two cell phones. *Id.* at 86; Commonwealth's Exhibit 7. [Sergeant] Chodubski stated that most people involved in drug trafficking have multiple cell phones. *Id.* at 86. When [Sergeant] Chodubski later arrested J.B., he identified him as Franzora Smith. *Id.* at 87.

On the day of Appellant's arrest, [Sergeant] Chodubski and other members of the Vice Unit followed Appellant most of the day. *Id.* at 88. At one point, Appellant went to the 3400 block of Cascade [Street] where he parked on the side of the street and a white female approached the car, got into the car, and exited a couple of minutes later. *Id.* at 90. When Appellant left, the detectives approached the woman, and the police recovered five grams of heroin from her. *Id.* at 91. The police obtained a search warrant for 1055 West 30th Street[,] and served the warrant approximately three hours later. *Id.*[] Thereafter, Appellant and Mr. Smith were arrested. *Id.* at 92.

On cross, [Sergeant] Chodubski testified that he received a complaint about a male named Juan, who he knew to be Appellant, from an individual in March of 2016, which commenced the investigation. *Id.* at 93. In March, April and May of 2016, the police did not conduct any controlled purchases involving Appellant. *Id.* at 96-[9]7. [Sergeant] Chodubski only saw Appellant in Erie on two occasions during the investigation: April 20, 2016 and May 19, 2016. *Id.* at 97-[9]8. On April 20, 2016, the police surveilled Appellant but did not receive any information of evidentiary value. *Id.*[] [Sergeant] Chodubski admitted that neither he[,] nor any of the detectives surveilling Appellant[,] saw him with any drugs or guns on May 19, 2016. *Id.* at 100. They also never saw him secrete any item from his vehicle to his residence or from his residence back to the vehicle. *Id.* The detective also testified that he conducted a videotaped interview of the white female at the police station prior to securing the search warrant. *Id.* at 108-[0]9. [Sergeant] Chodubski confirmed that a judge signed the warrant at 7:13 p.m. *Id.* at 109. [Sergeant] Chodubski admitted that he had never seen anyone sell drugs out of the house at 1055 West 30th Street. *Id.*

at 113. When confronted with a police report stating that the white female was videotaped at 8:17 p.m., [Sergeant] Chodubski changed his testimony to say that they interviewed her before getting the warrant, but did not record her statement until he obtained the warrant. *Id.* at 117. [Sergeant] Chodubski admitted that he did not obtain any fingerprint o[r] DNA evidence for any of the items seized from the residence. *Id.* at 120. He also admitted that he did not know who lived in the apartment, but said Mr. Smith and Appellant had access to it. *Id*. at 131.

After the cross-examination, the trial court agreed with the Commonwealth that defense counsel's questioning had opened the door to the Commonwealth['s] presenting more testimony about the white female. *Id.* at 121-[2]6. Specifically, the trial court permitted this re-direct because trial counsel questioned the timing of the warrant and the credibility of the officer as to when he received the information. *Id.* at 127. The trial court stated that it was only reasonable to give the officer the opportunity to explain why and how he did what he did. *Id.* After cross-examination was completed, the trial court recessed for the day.

On re-direct, [Sergeant] Chodubski identified the search warrant and affidavit of probable cause, and the trial court introduced this into evidence. [N.T. Trial, 8/15/2017,] at 24. [Sergeant] Chodubski explained that, after making their observations of the white female, the police took her back to the station, interviewed her, and used that information in the affidavit of probable cause to obtain the warrant. *Id.* at 25. The police then faxed the warrant to the district judge's office and then took her recorded statement. *Id.* [Sergeant] Chodubski said that the police recorded the statement for later use at trial. *Id.* Due to the woman's death, her statement could not be played to the jury. *Id.* [Sergeant] Chodubski also testified that the police sent the five grams of heroin that she purchased in the car to the State Police Crime Lab, who confirmed that the baggie contained heroin. *Id.* at 26.

[Sergeant] Chodubski also testified that Appellant made a post-arrest statement that he was aware of three handguns and one rifle in the residence. *Id.* at 27. Appellant said one of the guns was not functional and that the handguns came from a female whose boyfriend had been arrested and she did not want them anymore. *Id.* at 27. Appellant said she gave them to him to hide. *Id.* [Sergeant] Chodubski produced a State Police Report that all

of the recovered guns were functional. *Id.* at 28; Commonwealth's [Exhibit] 15.

[Sergeant] Chodubski also testified that two controlled buys were performed with J.B. on May 3, 2016 and May 11, 2016[,] and that the police used pre-recorded buy money in those transactions. *Id.* at 29. When the police arrested Mr. Smith on May 19, 2016, they uncovered approximately $1[,]500.00, which contained $40 of the pre-recorded buy money. *Id.*

On re-cross, [Sergeant] Chodubski confirmed that he had no prior relationship with the white female and that he did not have any personal knowledge as to whether she had the heroin on her person prior to going to Appellant's car. *Id.* at 31. [Sergeant] Chodubski admitted that this was not a controlled buy and that the woman avoided charges by agreeing to cooperate with the police. *Id.*

Defense counsel then asked about Appellant's statement to police and why Appellant only partially completed and did not ultimately sign the *Miranda*[3] waiver form. *Id.* at 31. [Sergeant] Chodubski stated that Appellant said he did not want to go on video for the statement but wanted to provide cooperation. *Id.* [Sergeant] Chodubski said the police did not memorialize their discussion with him by video or written statement. *Id.* at 32.

Next, Detective Matthew Benacci testified that he was contacted to assist with taking Appellant into custody on May 19, 2016. *Id.* at 37. The detectives followed Appellant's car into CVS, and Appellant went into the store. *Id.* at 38. [Detective] Benacci took Ms. Smith and Yusef Musafir into custody. *Id.* He took a cell phone from Ms. Smith's person, and two cell phones from Musafir. *Id.* at 39. Appellant had left the key to the car in the vehicle, and it was attached to a key ring with multiple other keys. *Id.* at 40. The keys … opened the exterior door to 1055 West 30th Street. *Id.* at 40, 61. However, there was not a key to the actual apartment door. *Id.* at 61. Appellant had left four cell phones in the vehicle and two more were recovered on his person. *Id.* at 40-[4]1. [Detective] Benacci also recovered Ms. Smith's purse in the trunk, which contained a brown shopping bag with $14[,]005.00 inside. *Id.* at 42.

_____

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

After participating in these apprehensions, [Detective] Benacci went back to 1055 West 30th Street to conduct further surveillance. *Id.* at 43. [Detective] Benacci had been told that J.B. had been outside of the residence talking on a cell phone. *Id.* at 43-[4]4. He observed J.B.['s] being picked up by a silver sedan, and the police stopped the vehicle and arrested him. *Id.* at 44. A search of Mr. Smith revealed sandwich baggies containing cocaine and heroin and $1[,]534.00, including some controlled buy funds. *Id.* They also recovered two cell phones and two sets of keys on his person to the apartment. *Id.* at 45-[4]6. The sandwich baggies contained numerous corners of small doses. *Id.*

[Detective] Benacci also participated in the search of 1055 West 30th Street. *Id.* at 47. The officers announced the warrant and then entered the apartment with Mr. Smith's keys. *Id.* at 47.

Next, Lieutenant Mike Nolan from the Erie Police Department testified as an expert in drug investigations, specifically, possession with the intent to deliver. *Id.* at 69. First, [Lieutenant] Nolan testified as a fact witness that he arrested Appellant inside the CVS store, while Appellant sat at a Western Union terminal. *Id.* at 74-[7]5. [Lieutenant] Nolan opined that Western Union is a common way for drug dealers to transfer money out of town because identification is not required. *Id.* at 75. At the time of his arrest, Appellant had $619 in cash on his person. *Id.* at 77.

The police submitted the baggies of suspected drugs found on Mr. Smith's person to the State Police Crime Lab, and the lab confirmed that one contained 2.34 grams of heroin and the other contained 1.96 grams of powder cocaine. *Id.* at 79.

[Lieutenant] Nolan was also present for the search of the apartment. *Id.* at 83. The officers discovered a Mosberg tactical .22 rifle leaning against the corner of the room in the front parlor of the apartment. *Id.* at 87. The[y] also discovered a clock in the parlor, which when the cover was removed, contained suspected narcotics. *Id.* at 88-[8]9. Specifically, there was a baggie of marijuana (8.75 grams), two baggies of heroin (9.24 grams), and three baggies of crack cocaine (32.16 grams). *Id.* at 89-90. These quantities and their packaging [were] consistent with bulk purchase. *Id.* at 91. Officers also found two digital scales, a screw press, and a bottle of creatinine in the kitchen. *Id.* at 91-[9]3. In the kitchen drawer, the officers also found a baggie containing 7.92 of lidocaine (a topical sedative) and 9.79

grams of a non-controlled sleep aid. *Id.* at 93-[9]4. [Lieutenant] Nolan opined that these substances were consistent with cutting agents. *Id.* at 94-[9]5. The officers also found a razor blade with white powder on it, which is consistent with the packaging of small quantities of drugs. *Id.* at 95. They also found inositol powder, baking soda, acetone, vinyl gloves and a respirator, which was consistent with trying to increase the quantity of drugs for sale. *Id.* at 97.

Officers also searched bags of garbage on the apartment's back deck and found hundreds of sandwich baggies with both [corners] cut off. *Id.* at 98. They also found vacuum seal bags consistent with the transport of large quantities of drugs. *Id.* at 99. In a bedroom that did not appear to be utilized, the officers found a hydraulic press. *Id.*[] Further, the officers found a prescription bottle for Appellant in the bathroom's medicine cabinet, and four pieces of mail addressed to Appellant at that address, including a Time Warner cable bill. *Id.* at 100. On the back of one envelope in the apartment, the officers found notations consistent with an owe sheet. *Id.* at 101; Exhibit 55. After unscrewing a piece of trim beneath the bathroom sink, [Lieutenant] Nolan uncovered three handguns wrapped in a T-shirt and a knotted baggie containing a large amount of loose ammunition. *Id.* at 104. There was also another plastic bag [containing] a large number of other suspected bags of cocaine and heroin. *Id.* at 104-[0]5.

The officers determined that one of the firearms had been reported stolen "a few months prior" in a burglary. *Id.* at 105-[0]6. Some of the baggies under the sink contained non-controlled substances; however, 33.82 grams of heroin was recovered there as well. *Id.* at 106-[0]7. They also recovered 113.48 grams of crack cocaine and 615 grams of powder cocaine. *Id.* at 107. [Lieutenant] Nolan characterized the quantity of drugs as indicative of dealing, not using, and opined that the street value of all the cocaine (760 grams) was $76,000.00. *Id.* at 108. The street value of all of the heroin recovered (43 grams) was $8[,]000.00. *Id.*[4]

_____

[4] Appellant notes that,

> Lieutenant Nolan testified that the total weight of the heroin in the apartment was 43 grams, not 93 grams. Even the total heroin

- 9 -

[Lieutenant] Nolan testified that, when [Sergeant] Chodubski was speaking with Appellant after the arrest, [Lieutenant] Nolan walked into the interview room. *Id.* at 112. Appellant looked up at him and said, "Good job, Mike, good fucking job." *Id.* Appellant then put his head down and shook his head. *Id.* Appellant also told the officers that he had sent a brick of cocaine and 100 grams of heroin to Erie and that it arrived two days before he got to Erie. *Id.* at 113. He said he hid three guns, although someone else had brought them to the apartment. *Id.*

The assistant district attorney asked the [lieutenant] if Appellant made any proposals to them about wanting to work for the Erie Police Department. *Id.* at 114. According to [Lieutenant] Nolan, Appellant said that he would help them get some "bigger fish" but he could not go to the county prison. *Id.* at 114. [Lieutenant] Nolan explained to the jury that Appellant did not want to be charged at that time because he would go to the county prison on a parole violation and people would learn that he had been arrested. *Id.* at 114. Appellant's counsel asked for a sidebar, due to [Lieutenant] Nolan's reference to Appellant's parole status. *Id.* at 115. Counsel asked for a mistrial due to the prejudicial reference to Appellant's criminal history. *Id.* After much back and forth between the parties, the trial court decided to deny the request for a mistrial but … tell the jury to disregard any of the statement Appellant made to [Lieutenant] Nolan in the interview room that would have given any indication that the men knew

---

weight calculated from the September 15, 2017 [Pennsylvania State Police] Lab Report was 44.07 grams. Nevertheless, the sentencing sheets prepared in Appellant's case provided guidelines for possession with the intent to deliver heroin between 50-100 grams, specifically, 93. This resulted in an [Offense Gravity Score (OGS)] of 10, rather than 8[,] for possession with [the] intent to deliver (heroin) and an invalidly inflated OGS for conspiracy to deliver heroin as well. However, this claim to the calculation was not raised by trial counsel at [the] time of sentencing or in a post-sentence motion.

Appellant's Brief at 48 n.2 (internal citations omitted). We agree that Appellant has waived this claim, as whether the court used an incorrect offense gravity score is a challenge to the discretionary aspects of a sentence. *See Commonwealth v. Lamonda*, 52 A.3d 365, 371 (Pa. Super. 2012).

each other. *Id.* at 125. The [c]ourt then gave an instruction. *Id.* at 127.

On cross-examination, [Lieutenant] Nolan testified that he had no evidence Appellant actually used Western Union when he was seated at the terminal. *Id.* at 139. [Lieutenant] Nolan also testified that Appellant had keys on his key ring for both the exterior and interior doors of the second floor apartment. *Id.* at 144. [Lieutenant] Nolan admitted that the pieces of mail found in the apartment for Appellant were from 2015[,] and two others were from March 24 and 28 of 2016. *Id.* at 150. Further, the date on the pill bottle was August 25, 2014. *Id.* at 151. [Lieutenant] Nolan reiterated that no controlled buys were conducted with Appellant during the investigation. *Id.* at 155. [Lieutenant] Nolan did testify, however, that they did some controlled buys with a person named Dee during the course of the investigation. *Id.* at 159. The parties stipulated that the three handguns were stolen, and then the Commonwealth rested. *Id.* at 171-[7]2.

The defense called Taleshia Johnson. Ms. Johnson testified that she lived at 1150 East 20th Street, in Erie, Pennsylvania[,] in May of 2016[,] and was eight and one-half months pregnant with Appellant's child at the time. *Id.* at 174. She had planned for Appellant to attend her baby shower on May 21, 2016. *Id.* at 175. Appellant came into town that week and stayed with her on two nights. *Id.* at 178. He had a key to her residence. *Id.* at 178. She recalled him staying with her on the night prior to his arrest. *Id.* at 179.

After deliberation, the jury convicted both men of all counts. N.T. Trial, 8/16/17, at 46-51. The [c]ourt excused the jury and then found both men guilty of persons not to possess. *Id.* at 54-[5]5.

On September 29, 2017, the trial court sentenced Appellant to an aggregate sentence of twenty-seven and one-half to fifty-five years' imprisonment. Three days after sentencing, Appellant's privately retained attorney filed a petition to withdraw. On October 31, 2017, the trial court granted counsel's request to withdraw. Trial counsel never filed a direct appeal despite acknowledging in his petition to withdraw that Appellant desired an appeal.

A flurry of docket activity occurred thereafter, culminating in Appellant['s] filing a timely first [Post Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541-9546,] petition, which was docketed

by the Clerk of Courts on November 20, 2017. Therein, Appellant sought the reinstatement of his direct appeal rights and the appointment of counsel. By [o]rder dated December 5, 2017, the PCRA court reinstated Appellant's direct appeal rights, but denied Appellant's request for appointment of counsel until Appellant filed the necessary documentation establishing his eligibility.

Appellant filed a timely *pro se* [n]otice of [a]ppeal with the accompanying financial information establishing his indigenc[e]. *Id.* at 44. The [c]ourt did not appoint counsel, but directed that Appellant could proceed [*in forma pauperis*] and must file a [c]oncise [s]tatement within 21 days. Appellant filed a *pro se* [c]oncise [s]tatement, and the trial court filed an opinion.

On May 29, 2018, the Superior Court entered an [o]rder acknowledging that Appellant had requested counsel, the trial court had previously permitted counsel to withdraw, and the trial court had not appointed counsel believing it lacked jurisdiction. The Superior Court remanded the record for a ***Grazier***[5] hearing and retained jurisdiction. By [o]rder dated July 3, 2018, the trial court appointed the Public Defender's Office, and the undersigned entered her appearance in the Superior Court.

The undersigned filed a Petition for Continued Remand to File Counseled Concise Statement and Preparation of Amended [Pa.R.A.P.] 1925(a) Opinion, which the Superior Court granted. Appellant filed this counseled [c]oncise [s]tatement on August 21, 2018, and the trial court ordered the transmission of the record without filing a further opinion.

Appellant's Brief at 11-26 (some internal citations omitted).

Appellant presents the following issues for our review:

1. Did the Commonwealth present insufficient evidence to sustain Appellant's conviction for receiving stolen property where the evidence does not establish the element that Appellant knew the guns were stolen or believed they were probably stolen?

2. Did the trial court commit an abuse of discretion when it denied Appellant's request for a mistrial as the Commonwealth's witness made reference to Appellant['s] being on parole and where the

---

[5] ***Commonwealth v. Grazier***, 713 A.2d 81 (Pa. 1998).

language of the trial court's instruction did not adequately address or cure the prejudice?

3. Did the trial court commit an abuse of discretion when it determined that Appellant's cross-examination of [Sergeant] Chodubski opened the door to the previously excluded out-of-court statements of Ashley Dumas?

4. Did the trial court impose illegal sentences for simple possession at Counts Five and Six where these convictions merged with the sentences for possession with the intent to deliver at Counts Two and Three of the information?

Appellant's Brief at 10 (unnecessary capitalization omitted).

Before we delve into Appellant's issues, we address the trial court's failure to file an amended Rule 1925(a) opinion. "The Rules of Appellate Procedure make the filing of a 1925(a) opinion mandatory…. The purpose of this rule is to provide the appellate court with a statement of reasons for the order so entered in order to permit effective and meaningful review of the lower court decisions." *Commonwealth v. Hood*, 872 A.2d 175, 178 (Pa. Super. 2005) (citations omitted). Moreover, "[o]rdinarily, the remedy for non-compliance with [Rule] 1925(a) is a remand to the trial court with directions that an opinion be prepared and returned to the appellate court." *Id.* (citation omitted). Nevertheless, this Court has stated that "the lack of a Rule 1925(a) opinion is not always fatal to our review, because we can look to the record to ascertain the reasons for the order." *Id.* (citation omitted). Further, this Court has declined to remand for the preparation of a Rule 1925(a) opinion where the issue on appeal raises a question of law because, "in deciding an issue of law, an appellate court need not defer to the conclusions of the trial court." *Cooke v. Equitable Life Assur. Soc. of U.S.*, 723 A.2d 723, 727

(Pa. Super. 1999) (declining to remand for the preparation of a Rule 1925(a) opinion addressing a contract interpretation issue because "[t]he reasoning of the trial court is not crucial to our determination of contract interpretation"); *see also Commonwealth v. Haughwout*, 837 A.2d 480, 487 n.11 (Pa. Super. 2003) ("We note that the trial court never issued a specific ruling or opinion addressing Haughwout's constitutional claims. However, in deciding issues of law, an appellate court need not defer to the conclusions of the trial court. Accordingly, the lack of a trial court opinion in the instant case does not hamper our review.") (citation omitted).

Here, Appellant raises claims challenging the sufficiency of the evidence, the denial of his request for a mistrial, the admissibility of certain evidence, and the legality of his sentence. The trial court's reasoning for denying Appellant's request for a mistrial and allowing certain evidence to be admitted at trial are apparent from the trial transcript. Further, sufficiency and legality of sentencing claims constitute questions of law, for which this Court does not need to defer to the conclusions of the trial court. *See Commonwealth v. Fennell*, 105 A.3d 13, 15 (Pa. Super. 2014) ("Issues relating to the legality of a sentence are questions of law[.]") (citation omitted); *Commonwealth v. Teems*, 74 A.3d 142, 144 (Pa. Super. 2013) ("A challenge to the sufficiency of the evidence is a question of law, subject to plenary review.") (citation omitted). Consequently, the trial court's failure to prepare an amended Rule 1925(a) opinion does not inhibit our review, and we therefore proceed to the merits of Appellant's arguments.

## Issue 1

In Appellant's first issue, he asserts that "[t]he Commonwealth presented insufficient evidence to sustain [his] conviction for receiving stolen property where the evidence does not establish as a matter of law that Appellant knew the guns were stolen or believed they were probably stolen." Appellant's Brief at 28 (emphasis omitted). He therefore asks us to vacate his judgment of sentence for this offense. *Id.* at 34.

> We apply the following standard of review to sufficiency claims:
>
> A challenge to the sufficiency of the evidence is a question of law, subject to plenary review. When reviewing a sufficiency of the evidence claim, the appellate court must review all of the evidence and all reasonable inferences drawn therefrom in the light most favorable to the Commonwealth, as the verdict winner. Evidence will be deemed to support the verdict when it establishes each element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. The Commonwealth need not preclude every possibility of innocence or establish the defendant's guilt to a mathematical certainty. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Teems*, 74 A.3d at 144-45 (citation omitted).

> Receiving stolen property is statutorily defined as follows:
>
> **(a) Offense defined.**--A person is guilty of theft if he intentionally receives, retains, or disposes of movable property of another knowing that it has been stolen, or believing that it has probably been stolen, unless the property is received, retained, or disposed with intent to restore it to the owner.
>
> **(b) Definition.**--As used in this section the word "receiving" means acquiring possession, control or title, or lending on the security of the property.

18 Pa.C.S. § 3925. "Based upon this definition, this Court has identified the elements of the crime … to be: (1) intentionally acquiring possession of the movable property of another; (2) with knowledge or belief that it was probably stolen; and (3) the intent to deprive permanently." **Commonwealth v. Robinson**, 128 A.3d 261, 265 (Pa. Super. 2015) (*en banc*) (citations omitted).

Here, Appellant solely contests whether the Commonwealth established the second element, *i.e.*, that he had "guilty knowledge of the crime." Appellant's Brief at 28-29. He directs us to **Robinson**, wherein we explained:

> Importantly, the Legislature expressly defined the required mental state [for receiving stolen property] as "knowing" or "believing." Because the Legislature excluded mental states such as recklessness, negligence, or naïveté about the stolen status of the property, those mental states are insufficient. This reasoning is consistent with the common recognition that penal statutes are to be strictly construed. Thus, courts may not hold that a less culpable mental state satisfies a criminal statute where the statute demands proof of the more culpable mental state.

**Robinson**, 128 A.3d at 265 (internal citations omitted).

Moreover, we observe that,

> [a] fact-finder may infer guilty knowledge that property was stolen based upon the recency of the theft, the place or manner of possession, alterations to the property indicative of theft, the defendant's conduct or statements at the time of arrest (including attempts to flee apprehension), a false explanation for the possession, the location of the theft in comparison to where the defendant gained possession, the value of the property compared to the price paid for it, or any other evidence connecting the defendant to the crime.

**In Interest of P.S.**, 158 A.3d 643, 651 (Pa. Super. 2017) (citing **Robinson**, 128 A.3d at 268)). Significantly, possession of stolen property, by itself, is

- 16 -

not sufficient to prove guilty knowledge. ***Robinson***, 128 A.3d at 269 (citations omitted).

In the case *sub judice*, the Commonwealth argues that "the nature of the stolen items and the circumstances in which the items were found must be considered." Commonwealth's Brief at 3. It contends that "[f]irearms, while not overly difficult to obtain, are a regulated item that one typically does not obtain in a casual way. Beyond the inherent nature of firearms, here, the firearms were found in a residence from which Appellant was conducting the sale of illegal drugs." ***Id.*** It points to the testimony of Lieutenant Nolan, who described the high value of firearms in the drug trade and shared that "drug dealers like to have guns taken in as [a] trade for drugs. We see it all the time and most of the guns we [have] recovered from drug dealers are stolen." Commonwealth's Brief at 4 (quoting Lieutenant Nolan's testimony at N.T. Trial, 8/15/2017, at 109-10). The Commonwealth argues that this "information lends context to the surrounding circumstances the jury considered in this case[,]" and "the fact that two stolen firearms and two other firearms were recovered also tends to show that [Lieutenant] Nolan's experience specifically applied in this case, as multiple stolen firearms lends credence to the argument that the firearms are used as currency." ***Id.*** at 5. The Commonwealth also adds that "the jury … had the ability to consider the explanation given by … Appellant of how the firearms came into his possession." ***Id.*** It recounts that "[Sergeant] Chodubski testified that Appellant explained he obtained the firearms from a female acquaintance's

boyfriend who had been arrested. Specifically, [Appellant] indicated to [Sergeant] Chodubski that the female told him she didn't want them anymore and that she gave the firearms to [Appellant] to hide." *Id.* (citation omitted). The Commonwealth says "[i]t is possible the jury wholly rejected the explanation Appellant gave to [Sergeant Chodubski] as not credible and thus considered it as a factor tending to point to guilt. Alternatively, the fact that … Appellant was given the firearms with the instruction to hide them could also have been considered as indicative of guilt." *Id.* at 5-6.

Appellant, on the other hand, argues that "[t]he parties stipulated that the firearms were stolen, but the only specific testimony about any of the firearms came from [Lieutenant] Nolan that one of the firearms had been reported stolen 'a few months prior' in a burglary." Appellant's Brief at 32 (citations omitted). Appellant reasons that, "[a]s one gun was stolen a few months before its discovery and the Commonwealth presented no evidence as to when the others were stolen, the Commonwealth cannot establish recency as a matter of law." *Id.* (citation omitted). Further, he discerns that "there is no evidence of record that connects [Appellant] to the actual thefts of the firearms. There is no evidence as to when [Appellant] gained possession of the firearm[s]. There is no evidence that anyone altered the weapon[s] or marred/mutilated the serial number[s]." *Id.* at 33. He also insists that, "[w]hile the Commonwealth presented testimony that drug dealing is violent and that firearms are utilized in the drug trade, this testimony does not offer any insight into what Appellant knew about the weapons. It also does not

- 18 -

prove that those charged with drug crimes only possess stolen weapons or believe their weapons were probably stolen." *Id.* (citation omitted). Finally, Appellant maintains that his explanation for how the guns came into his possession — that a female whose boyfriend had been arrested gave them to him — "does not suggest guilty knowledge of the firearms' stolen status. Rather, it suggests that the woman was not comfortable with having the guns in her home, wanted to be rid of them, and did not want her boyfriend to get them back. At the very worst, it suggests only that Appellant knew her boyfriend should not have firearms in his possession." *Id.* at 34.

We agree with Appellant that the evidence was insufficient to prove that he believed that the firearms had probably been stolen. That Lieutenant Nolan testified that most of the guns recovered from drug dealers are stolen does not demonstrate that Appellant believed his firearms were probably stolen. As Appellant posits, "the Commonwealth cannot satisfy its burden of proving a particular individual's *mens rea* with generalizations about the drug trade." *Id.* Furthermore, Sergeant Chodubski's testimony that "[Appellant] stated that the handguns came from a female, that her boyfriend was recently arrested on drug charges and she didn't want them anymore, so she gave them to him to hide" does not establish, beyond a reasonable doubt, that Appellant believed they were probably stolen. N.T. Trial, 8/15/2017, at 27.

Accordingly, we reverse Appellant's conviction for receiving stolen property and vacate his judgment of sentence for that offense.[6]

## **Issue 2**

In Appellant's second issue, he contends that "[t]he trial court committed an abuse of discretion when it denied Appellant's request for a mistrial as the Commonwealth's witness made reference to Appellant['s] being on parole and where the language of the trial court's instruction did not adequately address or cure the prejudice." Appellant's Brief at 34-35 (emphasis omitted). For such claims, we apply the following standard of review:

> The trial court is in the best position to assess the effect of an allegedly prejudicial statement on the jury, and as such, the grant or denial of a mistrial will not be overturned absent an abuse of discretion. A mistrial may be granted only where the incident upon which the motion is based is of such a nature that its unavoidable effect is to deprive the defendant of a fair trial by preventing the jury from weighing and rendering a true verdict. Likewise, a mistrial is not necessary where cautionary instructions are adequate to overcome any possible prejudice.

***Commonwealth v. Parker***, 957 A.2d 311, 319 (Pa. Super. 2008) (citation omitted). Further, we acknowledge:

---

[6] Appellant received a sentence of 33-66 months' incarceration for this offense, which was to run concurrently with his sentence of 60-120 months' incarceration for persons not to possess a firearm. ***See*** Appellant's Brief at 7-8 (setting forth the trial court's sentencing order). Because we can vacate this sentence without upsetting the overall sentencing scheme, we need not remand. ***See Commonwealth v. Thur***, 906 A.2d 552, 569-70 (Pa. Super. 2006) (determining that the trial court's overall sentencing scheme was not disturbed and no remand was necessary where the appellant's aggregate sentence was not affected by vacating his DUI sentence).

A mistrial is warranted when a juror could reasonably infer from the facts presented that the accused had engaged in prior criminal activity. When the statement at issue relates to a reference to past criminal behavior, [t]he nature of the reference and whether the remark was intentionally elicited by the Commonwealth are considerations relevant to the determination of whether a mistrial is required. A singular, passing reference to prior criminal activity is usually not sufficient to show that the trial court abused its discretion in denying the defendant's motion for a mistrial. When the trial court provides cautionary instructions to the jury in the event the defense raises a motion for mistrial, [t]he law presumes that the jury will follow the instructions of the court.

*Id.* (internal citations and quotation marks omitted).

Here, Appellant complains of the following testimony given by Lieutenant Nolan:

[The Commonwealth:] Okay. Now, real quick here, Sergeant Chodubski testified that [Appellant] was transported to the Erie Police Department where Sergeant Chodubski began an interview with [Appellant], right?

[Lieutenant Nolan:] Yes.

[The Commonwealth:] And you came into that interview halfway through, right?

[Lieutenant Nolan:] Yes.

[The Commonwealth:] Just … tell me what happened when you walked into that room, Lieutenant Nolan?

[Lieutenant Nolan:] I walked – [Appellant] was seated in the far corner of the room from the door, so when you walk in, he's the first one I see. So I walked into the room and I saw him and he was sitting. He looked up at me and … he said, "Good job, Mike, good fucking job," and he kind of put his head down and shook his head.

[The Commonwealth:] Now, he was freely talking to you, correct?

[Lieutenant Nolan:] Yes.

[The Commonwealth:] From that point on?

[Lieutenant Nolan:] Yes.

[The Commonwealth:] Was there a reference made to the drugs that were recovered from this house?

[Lieutenant Nolan:] Yes.

[The Commonwealth:] Okay. If you could tell us about that part of your conversation with [Appellant]?

[Lieutenant Nolan:] Well, Sergeant Chodubski and Triana were talking to him. I was doing something else. Triana called me, said, "Hey, he's starting to talk to us, do you want to come down and help?" So I did, that's when my initial encounter with him occurred there. They had not told him yet what we had found. And one of the detectives, I heard him ask him … how much did you bring here when you came? Apparently, they were that far along in the conversation. How much did you bring here? And his answer was, how much did you find? And I looked at him, [and] said, we found it, we got it all, we found it. And so I didn't tell him how much, but I told him we found it. And then he kind of … let out a big sigh, then he … explained what he said.

Can I refer to my report to get that?

[The Commonwealth:] Absolutely.

[Lieutenant Nolan:] Okay. Well, I quoted him here. He said, "Oh, you got it all?" That was a question he asked me. And then he said that he had sent a brick of cocaine and a hundred grams of heroin to Erie and that it arrived two days before he got here. He didn't elaborate on how it got here or who brought it here. And he also explained that he hid the three guns. I didn't note that he said where, but he said he hid the three guns and that someone else, though, had brought them to the apartment[,] not him.

[The Commonwealth:] Okay. Now, lastly, it's also common that[,] from time to time[,] you do use people that you think may be beneficial for you to further investigations, correct?

[Lieutenant Nolan:] Yes, we do.

[The Commonwealth:] Did [Appellant] make any proposals to you about wanting to work for the Erie Police Department?

[Lieutenant Nolan:] Yes, he did.

[The Commonwealth:] What did he say in that respect?

[Lieutenant Nolan:] Well, he told us that he'd be willing to help us get some bigger fish, and that. But he said he couldn't go to the county prison. So what that means is he can't charge me now, because if I go to the county prison, I'm on parole, and I'll be locked up in there or … everyone is going to know that I was – that's what it was. Everyone is going to know that I was locked up.

[Appellant's counsel:] Your Honor, excuse me. May we have a sidebar?

N.T. Trial, 8/15/2017, at 111-14.

At that point, Appellant's counsel requested a mistrial, explaining that Lieutenant Nolan's comment "implies clearly that [Appellant] has a criminal history which is not otherwise admissible and is prejudicial." *Id.* at 115. However, Appellant's co-defendant — Mr. Smith — did not join in the request for a mistrial, because Mr. Smith believed that some of Appellant's conversation with the detectives helped his defense. *Id.* at 119, 121. The trial court and the parties then debated if the trial court should grant a mistrial or give a curative instruction, during which time Appellant did not clearly object to the trial court's giving a curative instruction. *See id.* at 119 ("I just don't think there's any way of curing that with an instruction."); *id.* at 122 ("It's just glaringly obvious. I just don't know. It's brutal."); *id.* at 124 ("From my perspective, Your Honor, I just don't know how … I recover from that."). Upon discussing the matter with the parties, the trial court conveyed that it was "going to deny the motion for [a] mistrial because it was a comment in passing, and … [the court would] tell the jury to disregard any of the conversation that Lieutenant Nolan had with [Appellant] when he came into the interrogation room, up and through the point that he would have given

any indication there that they somehow knew each other…." ***Id.*** at 125.  Mr. Smith's counsel immediately sought clarification as to whether he is "allowed to get into any of the statements that [Appellant] made regarding his taking ownership of those items down in the residence[.]" ***Id.*** at 126.  The trial court directed that Mr. Smith was allowed to do that, but he could not get into any prior relationship between Lieutenant Nolan and Appellant.  ***Id.***  Further, the trial court indicated that Mr. Smith's counsel would not have to re-elicit this testimony from Lieutenant Nolan, but instead could rely on the initial testimony Lieutenant Nolan gave.  ***Id.*** at 126-27.  Appellant's counsel did not seek clarification or object to the phrasing of the trial court's proposed curative instruction.  ***See id.***  The trial court then reiterated its ruling, stating its finding that "this was just a comment in passing and not an intentional act by the Commonwealth to frustrate the case or prejudice [Appellant]."  ***Id.*** at 127. The trial court subsequently gave the jury the following instruction:

> [The court:] I'm going to give you an instruction with regard to Lieutenant Nolan's testimony that he had when he entered the interrogation room with [Appellant] up until the point indicating that they had some kind of prior relationship is to be disregarded by you, fully and completely.  And it's not evidence in this case under any circumstances, nor can it be used by you during your deliberations in this case.  Does everybody understand that?
>
> (Jurors nod affirmatively.)
>
> [The court:] Because those statements, that will be totally disregarded by you, all right?  Continue with your examination of Lieutenant Nolan.

***Id.*** at 127-28.

Appellant now argues that, although the Commonwealth did not appear to have intentionally elicited the at-issue remark from Lieutenant Nolan, Lieutenant Nolan "offered a gratuitous and unnecessary explanation including the parole status. Given [Lieutenant] Nolan's twenty-five years of experience in the Erie Police Department, … this remark evidenced a strong desire to prejudice Appellant in the eyes of the jury." Appellant's Brief at 39 (citations omitted). Moreover, Appellant says the trial court's curative instruction did not cure the prejudice because the trial court "did not clearly instruct the jury to not consider Appellant's parole status." *Id.* at 40. According to Appellant, "[t]he jury could have interpreted [the instruction] to mean that they should not consider the 'Good job, Mike' statement and nothing more." *Id.* Appellant also advances that, "[e]ven if the instruction could have been interpreted to include the conversation up through [Lieutenant] Nolan's discussion of Appellant's parole status, the instruction to fully and completely disregard the evidence ran contrary to the trial court's decision to allow the Commonwealth and Mr. Smith's attorney to make continued reference to the contents of this conversation during closings, while allowing Appellant's counsel to argue the evidence was stricken." *Id.* (citation omitted).

We discern no abuse of discretion. As the Commonwealth aptly reasoned:

> [T]he reference to Appellant's prior criminal record and parolee status was unintentional and innocuous. The specific nature of … Appellant's criminal history was not discussed, and the reference was made in passing during questioning about a conversation between Appellant and [Lieutenant] Nolan. Additionally, it was

not additional commentary [Lieutenant] Nolan gave. Rather, he was merely repeating what Appellant said to him.

Appellant also argues that the curative instruction given was insufficient to cure the prejudice. … While general, the instruction was not vague. Specifically, the [c]ourt instructed the jury not to consider the conversation between Appellant and … [Lieutenant] Nolan until and throughout the portion indicating they had a prior relationship. Rather than specifically call additional attention to the passing reference of Appellant's parolee status, the [c]ourt framed the instruction generally in an abundance of caution. This was not a decision made flippantly or in an off[-]handed manner. Instead[,] the nature of the instruction and what to instruct on was discussed with all parties prior to the jury['s] entering the courtroom. Moreover, trial counsel chose not to have the instruction clarified or expanded upon signifying the acceptance of the nature of the instruction as sufficient.

Commonwealth's Brief at 7-8 (internal citation omitted).

We find these points persuasive. Initially, we determine that the trial court did not abuse its discretion in finding that Lieutenant Nolan's remark did not warrant a mistrial, as it was made in passing and Lieutenant Nolan was repeating what Appellant had told him. In addition, to the extent Appellant complains of the specific curative instruction presented by the trial court, we deem that argument waived as Appellant's counsel did not clearly object to the trial court's providing a curative instruction in the first place, let alone challenge the particular instruction given or seek clarification regarding it. *See Commonwealth v. Page*, 965 A.2d 1212, 1222 (Pa. Super. 2009) ("No objection was made concerning the adequacy of the cautionary instruction. Where an objection is made, then a curative instruction issued, [the] appellant's only challenge is to the adequacy of the curative instruction. Because Appellant did not object to the instruction, any claim in relation to its

- 26 -

adequacy is waived.") (citation omitted). Accordingly, the trial court did not abuse its discretion in denying Appellant's request for a mistrial.

## Issue 3

In Appellant's third issue, he argues that "[t]he trial court committed an abuse of discretion when it determined that Appellant's cross-examination of [Sergeant] Chodubski opened the door to the previously excluded out-of-court statements of Ashley Dumas." Appellant's Brief at 42 (emphasis omitted). Appellant explains that "the Commonwealth [had] filed a pre-trial request to introduce the officers' personal observations of the interaction between Appellant and Ms. Dumas on May 19, 2016…. [T]he Commonwealth did not seek to introduce any out-of-court statements made by Ms. Dumas about what happened in the car with Appellant or from whom she received the suspected heroin." *Id.* at 43. Appellant says that the Commonwealth followed these parameters during its direct examination of Sergeant Chodubski. *Id* (citation omitted). Yet, on cross-examination, Appellant "inquired about the preparation of the search warrant, whether it occurred before or after their station interview with Dumas, whether it occurred before or after their video-recorded statement with Dumas, and whether they received the signed warrant before or after the video-recorded statement with Dumas." *Id.* at 43-44 (citation omitted). According to Appellant, based on his cross-examination, the Commonwealth consequently "took the position that Appellant had so questioned the officer's credibility as to whether Dumas

received drugs from Appellant that Appellant had opened the door to re-direct beyond the scope of the prior agreement." *Id.* at 44. As a result, Appellant explains the following occurred:

> [T]he Commonwealth's attorney clarified that [Sergeant] Chodubski should be permitted to testify as to why he interviewed [Dumas], why he preserved her statement, that Dumas had died, and that "the white female said that she got the heroin from the person in the vehicle, not going to say who that person is, she's [*sic*] not going to say she identified [Appellant]." [N.T. Trial, 8/15/2017], at 4-5. The trial court agreed and stated:

> > [E]ven though that's right on the edge — that's in the hearsay realm, it explains why the police officer did what he did in taking her to the police station, doing the affidavit, and Lieutenant Nolan['s] taking routine [*sic*] that was eventually going to execute the search warrant. And I did that because during the course of cross-examination by defense counsel, I believe that you asked questions that really challenged the credibility of [Sergeant Chodubski] and the value of whatever information that he received from the white female, who is no longer available due to her untimely death. And what is left in my impression immediately is that [Sergeant Chodubski] had absolutely no basis for what he did in going back to the station and obtaining a search warrant and the affidavit attached to the search warrant. It … really opened the door. In fact, it surprised me that you're doing what you're doing because I think it opened the door for you to rehabilitate the police officer to explain to the jury why he took the procedures that he did. … And he did, you know, obtain heroin. She told him at the time that she bought it from [Appellant]. And you're not getting into that area but — identifying him.

> *Id.* at 5-6.

> On re-direct, the Commonwealth introduced the search warrant and affidavit into evidence, discussed [Sergeant] Chodubski's transport of Dumas to the station, discussed his procedure for interviewing her when they arrived, had the officer explain that they record a statement for use at future trial, and that Dumas had died from a heroin overdose after the arrest. *Id.* at 24-25. The Commonwealth also showed [Sergeant] Chodubski an exhibit,

which he identified as "the five grams of heroin that she purchased that day from the car." *Id.* at 26. [Sergeant] Chodubski further testified that … the baggie contained 5.07 grams of heroin. *Id.*

Appellant's Brief at 44-46.

Appellant now argues that the trial court abused its discretion in allowing this testimony. He concedes that permitting Sergeant Chodubski to testify about "his transport of Dumas to the station and his procedure for interviewing and recording individuals was [a] fair response to the challenge to his credibility[,]" and that "reference on re-direct to Dumas'[s] death would eliminate any question in the minds of the jury as to why the Commonwealth did not call Dumas to corroborate his recollection." *Id.* at 47. However, Appellant contends that "Dumas'[s] statement to police about where she received the drugs does nothing to refute Appellant's challenge to [Sergeant] Chodubski's recollection of the timing of the warrant." *Id.* Instead, he says that "[t]he admission of this hearsay statement merely allowed the Commonwealth to directly tie Appellant to the delivery, without affording Appellant the ability to confront the source of this information." *Id.* Appellant adds that his "counsel did not attack Dumas'[s] credibility. Frankly, Dumas'[s] credibility was never at issue, because the entirety of the direct and cross[-]examination of [Sergeant] Chodubski related to his actions and his observations." *Id.* at 46.

> We apply the following standard of review:
>
> The admissibility of evidence is solely within the discretion of the trial court and will be reversed only if the trial court has abused its discretion. An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law,

or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record.

***Commonwealth v. Nypaver***, 69 A.3d 708, 716 (Pa. Super. 2013) (citations omitted).

Both parties agree that the statements of Ashley Dumas were inadmissible hearsay. ***See*** Appellant's Brief at 42-43; Commonwealth's Brief at 9. Notwithstanding, "[a] litigant opens the door to inadmissible evidence by presenting proof that creates a false impression refuted by the otherwise prohibited evidence." ***Nypaver***, 69 A.3d at 716 (citations omitted). In addition to attacking the timing of the warrant during his cross-examination, Appellant suggested that Sergeant Chodubski lacked probable cause to execute the warrant. ***See*** N.T. Trial, 8/14/2017, at 105 (asking if Dumas's vehicle was observed by the police prior to Sergeant Chodubski's seeing Dumas enter Appellant's vehicle); ***id.*** at 106 (noting that it was not a controlled purchase and that the police *believed* the heroin found on Dumas came from Appellant); ***id.*** at 107-08 (inquiring about who wrote the search warrant, where it was done, and how Dumas's statements were memorialized); ***id.*** at 109-11 (asking how Sergeant Chodubski got the warrant signed by a judge and who was in physical possession of the warrant when investigators entered the apartment at 1055 West 30th Street); ***id.*** at 116 (questioning, again, if Sergeant Chodubski had interviewed Dumas before applying for and obtaining the search warrant). As the Commonwealth discerns, "[t]hrough cross examination, Appellant gave the impression that

something problematic was occurring with respect to the search warrant, Ms. Dumas's cooperation and/or statement[,] and how [Sergeant] Chodubski obtained and/or used that information. Such an impression opens the door with respect to otherwise inadmissible hearsay in order to correct that implication." Commonwealth's Brief at 11; *see also id.* at 11-12 ("During cross-examination, Appellant called into question the basis for the search warrant, which was in part Dumas's statement that she received heroin from the other occupant of the vehicle she got out of. Presenting that information for the jury is the only thing that can eliminate the impression that the search warrant was insufficient or [Sergeant] Chodubski conducted himself improperly."). We agree with the Commonwealth, and conclude that the trial court did not abuse its discretion by allowing testimony that Dumas had indicated that she purchased the five grams of heroin from the person in the vehicle.

## Issue 4

Finally, Appellant states that "[t]he trial court imposed … illegal sentences for possession of a controlled substance where Appellant was convicted for possession with the intent to deliver the same substances." Appellant's Brief at 47 (emphasis omitted). He explains that, "the Commonwealth charged Appellant at Count Two with possession with intent to deliver (93 grams of heroin) and at Count Three with possession with intent to deliver (763 grams of cocaine). At Counts Five and Six, the Commonwealth charged Appellant with simple possession of the same substances and

quantities of substances." ***Id.*** at 48 (citations and footnote omitted). Citing to ***Commonwealth v. Murphy***, 592 A.2d 750 (Pa. Super. 1991), Appellant maintains that "[t]he trial court should have merged for sentencing purposes the crimes of possession of controlled substances and possession with intent to deliver since both charges stemmed from the same act of possession." ***Id.*** at 753 (citations omitted); ***see also*** Appellant's Brief at 48. He advances that "[t]he trial court appeared to recognize that these sentences should have merged, but instead elected to impose concurrent sentences[,]" and asks that we vacate the concurrent sentences imposed for simple possession at Counts Five and Six. ***Id.*** at 48-49. The Commonwealth agrees. ***See*** Commonwealth's Brief at 12 ("In review of the relevant case law and the record, the Commonwealth would agree that Appellant was illegally sentenced at these counts as Count 5 should have merged with Count 2 and Count 6 should have merged with Count 3."). Consequently, we vacate the concurrent sentences imposed for simple possession at Counts 5 and 6. Again, because we can vacate these sentences without upsetting the overall sentencing scheme, we need not remand. ***See Thur***, ***supra***.

Judgment of sentence for 18 Pa.C.S. § 3925(a) (receiving stolen property), 35 P.S. § 780-113(a)(16) (possession of a controlled substance - 93 grams of heroin), and 35 P.S. § 780-113(a)(16) (possession of a controlled substance - 763 grams of cocaine) vacated. Judgment of sentence affirmed in all other respects. Jurisdiction relinquished.

Judge Ott joins this memorandum.

Judge Strassburger files a concurring and dissenting memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 6/17/2019